[No. 3000.  Decided May 31, 1900.]

NORTHERN PACIFIC RAILWAY COMPANY, *Appellant,* v. PETER NELSON *et al., Respondents.*

PUBLIC LANDS—NORTHERN PACIFIC RAILROAD GRANT—WITHDRAWAL
    FROM SALE OR ENTRY—RIGHTS OF HOMESTEAD CLAIMANT.

Under the act of Congress of July 2, 1864 (13 St. at Large, 365), granting public lands to the Northern Pacific Railroad Company, whenever a plat of the general route of the road shall have been filed in the office of the commissioner of the general land office, § 6 of which act provides that the lands thereby granted "shall not be liable to sale, or entry, or preemption before or after they are surveyed, except by said company," the act, and the order of the commissioner of the general land office declaring that the company had duly filed such map showing its general route through certain public lands, and withdrawing from sale or entry all the odd numbered sections falling within the forty-mile limits of the land grant along said line, constitutes a withdrawal of said lands from sale or entry from that date, so that they are not subject to homestead entry, although the homestead claimant may have settled on a portion thereof prior to the definite location of the line of road.

SAME.

The act of Congress of July 2, 1864, authorizing the withdrawal from sale or entry of certain public lands along the line of the Northern Pacific Railroad excludes such lands from the operation of the homestead law, as the word "entry" covers homestead applications.

SAME—OCCUPATION WITH INTENT TO ENTER AS HOMESTEAD—EFFECT
    OF WITHDRAWAL FROM ENTRY.

The act of Congress of May 14, 1880 (21 St. at Large, 140), which provides that the rights of homestead settlers relate back

to the time of settlement, would not give an occupant of public lands, who did not actually make an entry of the same as a homestead until after they were withdrawn from entry by the secretary of the interior, a right to acquire title under the homestead laws.

Appeal from Superior Court, Yakima County.—Hon. JOHN B. DAVIDSON, Judge.    Reversed.

*Stephens & Bunn (James B. Kerr,* of counsel), for appellant.

*Kauffman & Frost,* for respondents.

The opinion of the court was delivered by

ANDERS, J.—This action was brought by the Northern Pacific Railway Company to recover from the defendant a certain described portion of an odd numbered section of land situated in Kittitas county, and lying within the place limits of the grant made to the Northern Pacific Railroad Company by act of Congress of July 2, 1864 (13 U. S. St. at Large, 365).    The complaint is in the ordinary form, and alleges the incorporation of the plaintiff; that it is the owner in fee and entitled to the possession of the land described in the complaint, and that the defendants are now unlawfully in possession of the said premises, and unlawfully withholding possession thereof from the plaintiff, and praying judgment against the defendants for the recovery of the possession of said premises, and for costs incurred in this action.    The answer of the defendants denies the allegations contained in the complaint, and avers affirmatively that in May, 1881, the defendant Henry Nelson went upon the lands described in plaintiff's complaint, which were at that time unoccupied lands of the United States; that he has ever since said date held, and still holds and occupies, the said lands under and by virtue of the homestead laws of the United States, and is entitled to continue in the peaceable possession

thereof. The reply is a general denial of the affirmative matter set up in the answer. The cause was submitted to the superior court upon an agreed statement of facts, and, after consideration of the facts agreed upon and the law applicable thereto, judgment was rendered in favor of the defendants, and the plaintiff thereupon appealed to this court.

It appears from the agreed statement of facts that the Northern Pacific Railway Company, appellant here, is a corporation organized and existing under and by virtue of the laws of the state of Wisconsin, and that said company, prior to the commencement of this action, succeeded to whatever right, title, claim, or demand the Northern Pacific Railroad Company had, if any, in or to the land described in the complaint herein; that the Northern Pacific Railroad Company is a corporation organized and existing under and by virtue of an act of Congress approved July 2, 1864, entitled, "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound, on the Pacific Coast, by the Northern route," and the acts and joint resolutions of Congress supplemental thereto and amendatory thereof; that the Northern Pacific Railroad Company accepted the terms, conditions, and impositions of said act within two years after the passage thereof, and signified such acceptance in writing, under the corporate seal of said company, executed pursuant to the direction of its board of directors first had and obtained, and on December 29, 1864, served such acceptance on the president of the United States; that the Northern Pacific Railroad Company fixed the general route of its road, extending coterminous with said land and within forty miles thereof, by filing a plat of such general route in the office of the commissioner of the general land office on August 20, 1873; that thereafter, and on November 1, 1873, the commissioner of the general

land office transmitted to the register and receiver of the United States district land office at Walla Walla, Washington Territory, that being the district land office for the district in which said land was situated, a letter of instructions, which, omitting dates and address, is as follows:

"The Northern Pacific Railroad Company having filed in this department a map showing the general route of their branch line, from Puget Sound to a connection with their main line near Lake Pend d'Oreille, in Idaho territory, I have caused to be prepared a diagram, which is herewith transmitted, showing the forty-mile limits of the land grant along said line, extending through your district, and you are hereby directed to withhold from sale or entry all the odd numbered sections falling within these limits not already included in the withdrawal for the main line. The even sections are increased in price to $2.50 per acre subject to pre-emption and homestead entry only. This withdrawal takes effect from August 15, 1873, the date when the map was filed by the company with the secretary of the interior, as required by the sixth section of the act of July 2, 1864, organizing said company;"

that the said diagram and letter were received and filed in the said United States district land office at Walla Walla, Washington Territory, on November 17, 1873; that the land described in the complaint herein was within the forty-mile limits of the land grant as designated in said diagram; that on December 8, 1884, the said Northern Pacific Railroad Company fixed the line of definite location of its railroad by filing a plat thereof, duly approved by the secretary of the interior, in the office of the commissioner of the general land office, and that prior to November 18, 1886, the said Northern Pacific Railroad Company constructed and completed a section of forty miles of the line of its said railroad and telegraph, extending over the said line of definite location and coterminous with the said land here in controversy; that the president of the United States, having appointed three commissioners to examine

the same, and said commissioners, having examined said railroad and telegraph line, reported on the 18th day of November, 1886, to the honorable secretary of the interior, that said lines were completed in all respects as required by the said act of Congress relating thereto; that on November 20, 1886, the secretary of the interior transmitted said report to the president of the United States, with recommendation that such railroad and telegraph line be accepted, and on the 7th day of December, 1886, the president of the United States approved such recommendation; that on May 10, 1895, the United States executed and delivered to the Northern Pacific Railroad Company its patent, wherein and whereby it purported to convey to said company the lands in controversy in this action, under the terms and provisions of the said act of Congress of July 2, 1864, and various acts and joint resolutions of Congress supplemental thereto and amendatory thereof; that the defendant, Henry Nelson, was, in the year 1881, qualified to enter public lands under the act of Congress approved May 20, 1862, entitled, "An act to secure homesteads to actual settlers on the public domain," and various acts supplemental thereto and amendatory thereof; that in the year 1881, said Henry Nelson went upon the lands in controversy, being the southeast quarter of section 27, in township 20 north, of range 14 east, W. M., and occupied the same, and has since continually resided thereon; that the said land was not surveyed by the United States until 1893; that as soon as the said land was surveyed, the defendant Henry Nelson attempted to enter the same, under the homestead laws of the United States in the United States district land office at North Yakima, Washington; that his proffered filing for said land was rejected by the register and receiver of said land office on the ground that said application conflicted with the grant to said Northern Pacific Railroad Company; that thereafter

the decision of the register and receiver was by the commissioner of the general land office confirmed.

It is conceded that the United States issued its patent to the Northern Pacific Railroad Company for the lands here in controversy, and it therefore follows that the legal title to the land was thereby conveyed to the company. The only question presented in this case for determination is whether the land department erred in its construction of the law, in issuing the patent to the railroad company; and it must be conceded that the department did err in so doing, if the land in question was open to homestead entry at the time it was settled upon and occupied by the respondent. It is shown by the agreed statement of facts, as we have seen, that the respondent went upon the land in 1881, and has ever since occupied the same, and that he offered to file a homestead application thereon immediately after the land was surveyed and the plat thereof filed in the local land office. But it is contended by the appellant that at that time the premises were not subject to homestead entry, for the reason that the land had previously been withdrawn from sale or entry by virtue of the act of July 2, 1864 (13 St. at Large, 365), and the executive order of November 1, 1873. And, after a careful consideration of the cases cited and all other cases we have been able to discover bearing upon the question at issue, we are constrained to conclude that the contention of the appellant must be sustained. Section 3 of the said act of July 2, 1864, provides as follows:

"That there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, . . . . every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through

any state, and whenever on the line thereof, the United States have full title not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office, and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

By section 6 of said act it was enacted:

"That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry, or pre-emption before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting pre-emption rights, and the acts amendatory thereof, and of the act entitled, 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road, when surveyed, excepting those hereby granted to said company.    And the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre, when offered for sale."

These provisions of this granting act to the Northern Pacific Railroad Company have been construed by the supreme court of the United States in numerous cases, and it seems to us that the question now under consideration has been settled by that tribunal.

In *Buttz v. Northern Pacific Railroad,* 119 U. S. 55 (7 Sup. Ct. 100), a settler entered upon land on October

5, 1871, with the intent of securing the same under the pre-emption laws of the United States. The land was at that time within the limits of an Indian reservation, the Indian title to which was not extinguished until June 19, 1873. On February 21, 1872, the railroad company filed its map showing the general route of the road, and on March 30, 1873, the land was withdrawn in favor of the company. On the 11th day of August, 1873, and within three months after the government survey of the land, the pre-emption claimant presented his declaratory statement to the register and receiver of the local land office. The court in that case, referring to the act of July 2, 1864, said:

" The act of Congress not only contemplates the filing by the company, in the office of the commissioner of the general land office, of a map showing the definite location of the line of its road, and limits the grant to such alternate odd sections as have not, at that time, been reserved, sold, granted, or otherwise appropriated, and are free from pre-emption, grant, or other claims or rights; but it also contemplates a preliminary designation of the general route of the road, and the exclusion from sale, entry, or pre-emption of the adjoining odd sections within forty miles on each side, until the definite location is made. The third [sixth] section declares that after the general route shall be fixed, the president shall cause the lands to be surveyed for forty miles in width on both sides of the entire line as fast as may be required for the construction of the road, and that the odd sections granted shall not be liable to sale, entry, or pre-emption, before or after they are surveyed, except by the company."

The court, after stating when the general route of the road may be considered as fixed, proceeded, on page 72, as follows:

" When the general route of the road is thus fixed in good faith, and information thereof given to the land department by filing the map thereof with the commissioner

of the general land office, or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections to the extent of forty miles on each side. The object of the law in this particular is plain: it is to preserve the lands for the company to which, in aid of the construction of the road, it is granted. Although the act does not require the officers of the land department to give notice to the local land officers of the withdrawal of the odd sections from sale or pre-emption, it has been the practice of the department in such cases, to formally withdraw them. It cannot be otherwise than the exercise of a wise precaution by the department to give such information to the local land officers as may serve to guide aright those seeking settlements on the public lands; and thus prevent settlements and expenditures connected with them which would afterwards prove to be useless. Nor is there anything inconsistent with this view of the sixth section as to the general route, in the clause in the third section making the grant operative only upon such odd sections as have not been reserved, sold, granted, or otherwise appropriated, and to which pre-emption and other rights and claims have not attached, when a map of the definite location has been filed. The third section does not embrace sales and pre-emptions in cases where the sixth section declares that the land shall not be subject to sale or pre-emption. The two sections must be so construed as to give effect to both, if that be practicable."

In *St. Paul & P. R. R. Co. v. Northern Pacific R. R. Co.,* 139 U. S. 1 (11 Sup. Ct. 389), both parties to the controversy claimed certain land by virtue of a congressional grant. It appeared that the land in controversy had been withdrawn by an order made by the secretary of the interior for the benefit of the Northern Pacific Railroad Company, and upon the subject of withdrawal the court said:

"Besides, the withdrawal made by the secretary of the interior of lands within the forty mile limit, on the 13th of August, 1870, preserved the lands for the benefit of the

34—22 WASH.

Northern Pacific Railroad from the operation of any subsequent grants to other companies not specifically declared to cover the premises. The Northern Pacific act directed that the president should cause the lands to be surveyed forty miles in width on both sides of the entire line of the road, after the general route should be fixed, and as fast as might be required by the construction of the road, and provided that the odd sections of lands granted should not be liable to sale, entry or pre-emption before or after they were surveyed, except by the company. They were therefore excepted by that legislation from grants, independently of the withdrawal by the secretary of the interior. His action in formally announcing their withdrawal was only giving publicity to what the law itself declared. The object of the withdrawal was to preserve the land unencumbered until the completion and acceptance of the road."

Then, after quoting from the opinion in the case of *Buttz v. Northern Pacific R. R. Co., supra,* the court further observed:

" After such withdrawal, no interest in the lands granted can be acquired, against the rights of the company, except by special legislative declaration, nor, indeed, in the absence of its announcement, after the general route is fixed."

The same doctrine was announced in the subsequent case of *United States v. Southern Pacific R. R. Co.,* 146 U. S. 570 (13 Sup. Ct. 152). The court in that case expressly approved the language we have quoted from the case of *Buttz v. Northern Pacific R. R. Co.*

In *Wood v. Beach,* 156 U. S. 548 (15 Sup. Ct. 410), two orders of withdrawal were made by the department of the interior,—one in favor of the Leavenworth, Lawrence & Galveston R. R. Co.; the other in favor of the Missouri, Kansas & Texas Ry. Co. After these orders of withdrawal were received at the local land office, one Wood made application to enter the land as a homestead;

and the court, in considering the effect of those with-
drawals, used the following language:

"It was said in *Wolsey v. Chapman,* 101 U. S. 755,
768: 'The proper executive department of the govern-
ment had determined that, because of doubts about the
extent and operation of that act, nothing should be done
to impair the rights of the state above the Raccoon Fork
until the differences were settled, either by Congress or
judicial decision.   For that purpose an authoritative
order was issued, directing the local land officers to with-
hold all the disputed lands from sale.   This withdrew
the lands from private entry, and, as we held in *Riley v.
Wells,* was sufficient to defeat a settlement for the purpose
of pre-emption while the order was in force, notwithstand-
ing it was afterwards found that the law, by reason of
which this action was taken, did not contemplate such a
withdrawal.'   This has been and is the settled rule of the
courts and the land department.   It is only a recognition
of the limitations prescribed in the statutes, for, by Rev.
Stat. § 2258, 'lands included in any reservation by any
treaty, law or proclamation of the president, for any pur-
pose,' are expressly declared to be not subject to the rights
of pre-emption, and § 2289, the one giving the right to
enter for a homestead, limits that right to 'unappropriated
public lands.'   The fact that the withdrawals were made
by order of the Interior Department, and not by proclama-
tion of the President, is immaterial."

In *Northern Pacific R. R. Co. v. Colburn,* 164 U. S.
383 (17 Sup. Ct. 98), the court held that mere occupation
or cultivation of premises at the time of the filing of the
map of definite location, unaccompanied by any filing of
a claim in the land office, then or thereafter, did not ex-
clude the tract from the operation of the land grant, and
in its opinion said that "frequent decisions of this court
have been to the effect that no pre-emption or home-stead
claim attaches to a tract until an entry in the local land
office."

And again it is said by the court, in *Menotti v. Dillon,* 167 U. S. 703, 721 (17 Sup. Ct. 951), in speaking of the effect of a withdrawal order made by the secretary of the interior:

"That order took these lands out of the public domain as between the railroad company and individuals, but they remained public lands under the full control of Congress, to be disposed of by it in its discretion at any time before they became the property of the company under an accepted definite location of its road."

In *Northern Pacific R. R. Co. v. Musser-Sauntry Land, etc., Co.,* 168 U. S. 604 (18 Sup. Ct. 205), the same question was presented to the court. In that case certain lands had been granted to the state of Wisconsin to aid in the construction of a railroad, and the same were claimed by the Northern Pacific Railroad Company as part of the grant to it, and in that case the court said:

"But a single question is presented in this case, and that is whether the withdrawal from sale by the land department in March, 1866, of lands within the indemnity limits of the grant of 1856 and 1864 exempted such lands from the operation of the grant to the plaintiff. It will be perceived that the grant in aid of the defendant railway company was prior in date to that of the plaintiff, and that before the time of the filing of plaintiff's maps of general route and definite location the lands were withdrawn for the benefit of the defendant. The grant to the plaintiff was only of lands to which the United States had 'full title, not reserved, sold, granted or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed.' The withdrawal by the secretary in aid of the grant to the State of Wisconsin was valid, and operated to withdraw the odd numbered sections within its limits from disposal by the land officers of the government under the general land laws. The act of the secretary was in effect a reservation. *Wolcott v. Des Moines Co.,* 5 Wall. 681; *Wolsey v. Chapman,* 101 U. S. 755, and cases cited in the opinion; *Ham-*

blin v. Western Land Company, 147 U. S. 531, and cases
cited in the opinion.    It has also been held that such a
withdrawal is effective against claims arising under sub-
sequent railroad land grants."

The rule announced in the foregoing cases was adhered
to in the late case of Northern Pacific R. R. Co. v. Am-
acker, 175 U. S. 564 (20 Sup. Ct. 236).    It was there
held that homestead entries made prior to the time when
notice of withdrawal of the lands is received by the local
land office, although after the time when the map of the
general route of the railroad was filed in the office of the
secretary of the interior, were made valid by the act of
Congress of April 21, 1876, if the entries were made in
good faith by actual settlers upon tracts of not more than
160 acres each, and that they were therefore subject to the
provisions of the act of June 15, 1880, authorizing the
purchase of such lands by persons who have entered them,
or their transferees by bona fide instruments in writing.
The contest in that case, as stated by the court, was be-
tween one claiming under homestead entry and a company
claiming under a grant in aid of a railroad, and in the
course of the opinion it is said:

"They [meaning a majority of the court] are of the
opinion that the effect of the act of 1876 was to validate
all otherwise regular pre-emption and homestead entries
made prior to the time when the notice of the withdrawal
was received at the local land office, although such entries
were made after the time the map of general route was
filed in the office of the secretary of the interior, and the
order of withdrawal made; that the withdrawal authorized
by the sixth section of the act making the land grant to the
Northern Pacific Railway Company, did not vest in the
company any title to the lands within the withdrawal
limits, but only operated by legislative declaration and
subsequent executive action to withdraw those lands from
homestead or pre-emption entries."

This decision contains the latest expression we have seen of the supreme court of the United States upon the question in controversy here, and it will be perceived that it is a virtual reaffirmance of the previous rulings of the court. It is claimed, however, by the learned counsel for the respondent, that a different rule was announced in *Northern Pacific R. R. Co. v. Sanders,* 166 U. S. 620 (17 Sup. Ct. 671), but we do not so understand the decision in that case. The Northern Pacific Railroad Company claimed the lands involved in that action under the grant of July 2, 1864. The company filed its map designating the general route of the road in 1872, and in 1882 filed its map indicating the definite location of its line of railroad; and prior to this latter date certain persons had made application to purchase the land, as mineral land, under the laws of the United States.     At the time of the filing of the map of definite location, these applications were pending and undetermined, and the court held that these applications constituted a "claim," in contemplation of the act of July 2, 1864, and that the lands so claimed as mineral lands were not included in the grant.     It may be said in this connection that the said act of July 2, 1864, especially excluded all mineral land from the grant made to the railroad company; and, of course, the executive orders withdrawing the land from sale or entry did not affect lands not included in the grant.     Moreover, the attention of the court in that case was especially directed to the case of *Buttz v. Northern Pacific R. R. Co., supra,* and in reference to that case the court, at page 636, observed:

" On one side it is said that that case construes the sixth section of the act of 1864 as excluding the possibility of *any* right being acquired adversely to the railroad company to an odd numbered section embraced by the exterior lines of the general route after that route had been established.     On the other side it is contended that the only

point necessary to be determined and the only one judicially determined in that case was that the defendant could not initiate a pre-emption right to the land there in dispute so long as the Indian title referred to in the opinion was unextinguished. Without stopping to examine these contentions, it is sufficient to say that the *Buttz Case* involved no inquiry as to the respective rights of the railroad company under the act of 1864, and of parties making applications in due form prior to the definite location of its road to purchase lands as mineral lands that were within the exterior lines of its general route."

We therefore conclude, from the language above quoted, that it was not the intention of the court in that case to overrule the decision in the *Buttz Case,* or subsequent cases announcing the same doctrine.

It is also contended by the respondent that the withdrawal order above set forth did not, in any event, exclude the lands attempted to be withdrawn from the operation of the homestead law, for the reason that the local land officers were directed to withhold all the odd numbered sections from sale or entry simply; but we think the word "entry" covers homestead applications, as well as what is generally known as a private entry of lands after the close of public sales. The word "entry" means that act by which an individual acquires an inceptive right to a portion of the unappropriated soil of the country by filing his claim in the appropriate land office. See, *Denny v. Dodson,* 32 Fed. 899, 910; *Chotard v. Pope,* 12 Wheat. 586.

It is also claimed by the respondent that he had a right to enter the land in controversy, under the homestead laws, by virtue of the act of Congress of May 14, 1880 (21 St. at Large, 140), which provides that the rights of homestead settlers, like those of pre-emptioners, relate back to the time of settlement. That statute was invoked in *Maddox v. Burnham,* 156 U. S. 544 (15 Sup. Ct. 448),

but the court there held that mere occupation of the public land for the purpose of subsequently entering the same as a homestead, but without actually making such entry until after the lands were withdrawn by order of the secretary of the interior, gave the occupant no right thereafter to obtain the title to the land under the homestead laws.

For the reasons indicated, the judgment of the court below is reversed and the cause remanded, with directions to enter judgment for the appellant for the possession of the lands described in the complaint.

GORDON, C. J., and REAVIS and DUNBAR, JJ., concur.