STATE of Alaska, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, Appellant,

v.

2.072 ACRES, MORE OR LESS; 5.450 Square Feet, more or less; Troy Hodges, Sr., a/k/a Troy D. Hodges; Norma Hodges; Irl Dale Robinson; Doris E. Robinson; Lowell D. Kellogg; Beverly Jean Wagner; Bertram C. Kellogg; George B. Frederickson; Pearl M. Frederickson; Evelyn Huggins d/b/a Huggins Realty; National Bank of Alaska; Alaska Title Guaranty Co.; Security Title & Trust Company; Kenai Peninsula Borough, Appellees.

No. 6159.

Supreme Court of Alaska.

Oct. 15, 1982.

Bruce Tennant, Asst. Atty. Gen., Anchorage, Wilson L. Condon, Atty. Gen., Juneau, for appellant.

Edward L. Garnett, Kenai, for appellees Troy D. Hodges, Sr. and Norma Hodges.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

OPINION

PER CURIAM.

For the purpose of improving Funny River Road, the State determined to take 2.072 acres of land belonging to Troy and Norma Hodges and attempted to do so using the device of a declaration of taking. However, AS 09.55.430(7) provides that a declaration of taking shall contain "a statement that the property is taken by necessity for a project located in a manner which is most compatible with the greatest public good and the least private injury; AS 09.55.-460(b) provides that the title vested in the condemnor in a declaration of taking proceeding may be divested "where the court finds that the property was not taken by necessity for a public use or purpose in a manner compatible with the greatest public good and the least private injury." After holding a hearing, the superior court determined that the taking of the 2.072 acres was unnecessary and thus could not be permitted. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This dispute concerns the Funny River Road Project. The purpose of the project is to improve Funny River Road generally, and in particular to make it safer in certain areas. Construction on the project has not yet begun. The federal government will provide ninety-five percent of the funding for construction of the Project. To receive this funding, the federal government requires that the State comply with the road safety standards of the American Association of State Highway and Transportation Officials (AASHTO).

Troy and Norma Hodges live on an eighty acre parcel (Parcel 21) which they own on the northern side of Funny River Road across the highway from the Soldotna Airport. At Station 62 + 19, which is in front of the Hodges' property, the road curves south away from the Hodges and toward the airport. Also, at this point there is a gradual hill (vertical curve).

As part of the Funny River Road Project, the State plans to take 2.072 acres from the Hodges—a fifty foot wide strip from Station 62 + 19 to Station 65, and a thirty-three foot wide strip from Station 65 to the end of the Project.[1] The taking will not include the Hodges' house. Rather, it will include lawn areas, two flower beds, an abandoned well, an antenna tie-down and part of the driveway. The taking will make it necessary to regrade the Hodges' driveway. The State will pay for the re-grading.

The State's overall purpose in taking the 2.072 acres beginning at Station 62 + 19 is to improve safety. To accomplish this purpose it intends: (1) to widen the road from twenty-eight to thirty-four feet; (2) to widen the right of way on each side of the road; and (3) to move the centerline of the road seventeen feet north beginning at Station 62 + 19. The State wants to move the centerline seventeen feet north at Station 62 + 19 so it can eliminate a horizontal curve to the south occurring at that point, and thus improve safety. Due to the combined effect of the horizontal curve, and the gradual hill or vertical curve which also occurs at Station 62 + 19, oncoming cars falsely appear to be on the wrong side of the road to drivers going up the hill. Also, drivers do not see the horizontal curve until they actually reach it. The combined horizontal and vertical curves fail to comply with AASHTO safety standards. The State proposes to bring the road into compliance with AASHTO standards by eliminating the horizontal curve as indicated above and by reducing the height of the vertical curve.

The superior court held that the Hodges had shown by clear and convincing evidence that the taking of this portion of their land was not necessary. For the reasons set forth herein, we affirm.

## II. NECESSITY

AS 09.55.430(7) provides:

The declaration of taking shall contain (7) a statement that the property is taken by necessity for a project located in a manner which is most compatible with the greatest public good and the least private injury.

AS 09.55.460(b) provides:

The plaintiff may not be divested of a title or possession acquired except where the court finds that the property was not taken by necessity for a public use or purpose in a manner compatible with the greatest public good and the least private injury.

In construing these provisions we have stated:

"The mandate of AS 09.55.460(b) is that 'private injury' be considered with reference to the particular properties involved. In our view the statute contemplates that the injuries suffered by each individual should be minimized to the extent that it is reasonably possible to do so without impairing the integrity and function of the project and without adding unreasonable costs to the project. [Footnote omitted.]

Striking the ultimate balance is, of course, a decision to be made by the condemnor. A court should not substitute its judgment for that of the condemnor but may set aside the condemnor's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' "

*State v. 0.644 Acres,* 613 P.2d 829, 832–33 (Alaska 1980). We noted in *0.644 Acres* that the State's determination of the least

---

1. The construction project is divided into 100 foot sections for reference and locating purposes. Each 100 feet is a station so that any point on the project may be located by refer-

ring to the station or portion of a station. Thus, a point referred to as Station 62 + 19 would be 6,219 feet from the reference starting point of the stationing.

private injury and the greatest public good must be a rational one, *ibid.* at 831, and that a decision must be considered arbitrary where the condemnor has failed to consider all important, relevant factors in making its determination. *Ibid.* at 833.

The Hodges note that there are two methods of bringing the curves into compliance with AASHTO standards which would intrude less upon their property rights than does the method the State has selected. The Hodges argue that the State did not consider all important, relevant factors when it rejected these two alternatives. Thus, the Hodges conclude that the condemnor's decision was arbitrary rather than rational.

Under one of the rejected alternatives, the State would move the centerline south instead of seventeen feet north at Station 62 + 19 and would take land from the Soldotna Airport rather than from the Hodges. Adoption of this alternative would cause three problems. First, moving the centerline south rather than seventeen feet north would exacerbate rather than eliminate the present horizontal curve to the south at Station 62 + 19. Second, on the south side of the road beginning at Station 71, the Soldotna Airport has a paved aircraft parking apron coming to within a few feet of the existing road. If the centerline is moved south, it will run through this aircraft parking apron.

The third problem concerns aboveground telephone lines which run on both the north and south sides of the road. The telephone company has scheduled replacement of the line on the north side regardless of the outcome of the Funny River Road Project. Thus, moving the centerline south will also necessitate moving the telephone line. Conversely, moving the centerline to the north would avoid an additional move of the lines.

As to the first problem, the State admits that there is a method whereby it could move the centerline south and still eliminate any safety hazard at Station 62 + 19 and comply with AASHTO standards. This method would entail rebuilding the road so that the curve begins much sooner than it does and extends over a longer distance. This would lengthen the curve.

The State decided not to lengthen the curve because it believed lengthening the curve would necessitate costly purchases of additional land from Parcels 16, 18 and 20 which are on the south side of the road prior to Station 62 + 19 and the Soldotna Airport. However, in deciding not to lengthen the curve, the State failed to make even a rough quantitative estimate of either how much land it would have to purchase or how much such purchases would cost.

Without these quantitative estimates, we cannot discern whether it was reasonable for the State to conclude that lengthening the curve would require costly land acquisitions from Parcels 16, 18 and 20. We note that the road, even as widened by the Project, is only thirty-four feet wide. The State already owns an eighty-three foot wide right of way in front of Parcels 16, 18 and 20. Further, the State plans to purchase an additional thirty foot wide swath of right of way in front of Parcel 20 even though the State does not plan to lengthen the curve.

On its face, it is arguable that a right of way varying between eighty-three and 113 feet should be sufficient for a thirty-four foot wide road even if the curve is lengthened. Consequently, quantitative estimates of the amount and cost of the land which would have to be taken if the curve is lengthened are important, relevant factors.

As indicated above, the second factor which caused the State to reject the alternative of moving the centerline south is that the road would then go through the Soldotna Airport aircraft parking apron which begins at Station 71. The State, however, could move the centerline south and then curve it back north prior to Station 71 so as to avoid the parking apron. It may be that this alternative would be costly, or that it would be impossible to curve the road north and still comply with AASHTO standards. However, we do not know whether it would be too costly since the

State failed to estimate the cost. We also do not know if it would be possible to comply with AASHTO standards since the State failed to consider whether such compliance would be possible.

As an alternative to curving the centerline back north to avoid the parking apron, the State might instead relocate the parking apron. The State never considered this possibility. The record does not indicate whether there is land available for relocating the parking apron or how much such a relocation would cost. The State should have considered the possibility of relocating the parking apron, whether there is land available for the relocation, and how much the relocation would cost.

The third problem with moving the centerline south is that it would necessitate the relocation of a telephone line. However, the State's witness at the hearing was unable to provide an estimate of the cost of the relocation. The cost estimate is an important, relevant factor.

In summary, the State did not consider the following important, relevant factors when it rejected the idea of moving the centerline south:

(1) the amount and cost of land acquisition from parcels 16, 18 and 20 which would be required if the curve at Station 62 + 19 were lengthened;

(2) the cost of curving the centerline back north before Station 71 so as to avoid the aircraft parking apron;

(3) whether it would be possible to curve the road back north before Station 71 and still comply with AASHTO standards;

(4) whether there is land available to relocate the aircraft parking apron, and the cost of the relocation; and

(5) the cost of moving the telephone line.

The State's failure to consider these important, relevant factors makes it impossible to rationally determine whether the intended taking is "compatible with the greatest public good and the least private injury." [2]

2. AS 09.55.460(b).

In deciding to move the centerline seventeen feet north, the State failed to consider a second alternative of keeping the centerline where it is and widening the road by taking land from both sides, i.e. from both the Hodges and the Airport. The State apparently has a general policy of widening roads all on one side rather than some on each side. At the hearing, Guy Green of the State Department of Transportation attempted to explain the reasons for the policy as follows:

A: [O]ur roadway construction is easier accomplished and we get a better product if the widening is all done to one side . . . .

Q: Okay. Then the policy of the department take all off of one side—the widening off of one side is a matter of choice, it has absolutely nothing to do with necessity or need, it's just a matter of choice.

A: No, I think that we make some comparisons, there are many factors that we have to consider. We have to consider existing utilities that are in place and we try to look at the overall cost picture of what it's going to cost us. And we try to provide the best and the safest facility that we can.

We do not find Green's explanation satisfactory. He did not explain why a road is better if it is widened all on one side, and thus we cannot discern whether the policy of widening all on one side rather than some on each side has a rational basis. The State should either have sufficiently explained its general policy of not widening on both sides so that we could have discerned that the policy is rational, or the State should have given serious consideration to the possibility of widening on both sides. Again, the State's failure to take either step precluded a rational determination of whether the intended taking is " . . . compatible with the greatest public good and the least private injury." [3]

3. Indeed, we have serious doubts as to whether any such general policy could meet the requirement of the statute of "individualized consider-

For the reasons set forth above, the State cannot presently take the Hodges' land. Failing as it did to consider critical information, the State's action is arbitrary.[4] However, if the State takes into consideration the factors set forth in this opinion and again determines that taking the 2.072 acres from the Hodges is necessary, it may initiate new proceedings to take the land. Under such circumstances, we will uphold the taking against a challenge by the Hodges unless the State's decision is in some other respect arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.[5]

AFFIRMED.

RABINOWITZ, Justice, dissenting.

I am of the view that the court's opinion has placed too high a burden upon the state to establish the validity of its condemnation. On this record I would reverse the superior court's determination that the taking of the Hodges' 2.072 acres is unnecessary and therefore barred.

In *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215–1216, 55 L.Ed.2d 460, 484 (1978) the Supreme Court observed:

> Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are

simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

Unfortunately, the common sense approach of *Vermont Yankee* appears to have been overlooked by the majority.[1]

If the court's approach is carried out fully in future cases, a condemnee will be able to attack a condemnor's determination of necessity simply by pointing out that the condemnor failed to consider some alternative in detail.[2] Once the condemnee does this, the condemnor will be under a burden to show either that it did consider the alternative or that the alternative did not have to be considered because it was completely infeasible. Regardless of which course of action it chooses to take, the condemnor will have to present substantial evidence in support of its assertions. Exhaustive cost estimates will be required to back up assertions about costs even in situations where common sense indicates that the alternative in question would involve substantial expense. Only after the condemnor has presented detailed evidence that it considered all possible alternatives or had good reasons for not doing so, will the condemnee be required to shoulder the burden of proving by clear and convincing evidence that the condemnor's evaluation of the alternatives and

---

ation of the private injury to be suffered by each landholder...." *State v. 0.644 Acres,* 613 P.2d 829, 832 (Alaska 1980).

**4.** *State v. 0.644 Acres, More or Less,* 613 P.2d 829, 833 n. 13 (Alaska 1980).

**5.** The Hodges argue that airport land should be taken rather than their land because the road project mainly benefits the airport and also because the airport is publicly owned whereas their land is private. We reject the Hodges' argument. AS 09.55.460(b) commands that the taking "be by necessity for a public use or purpose in a manner compatible with the greatest public good and least private injury." Whether the road project mainly benefits the airport and whether the land to be taken is public or private are irrelevant to the statutory command.

The Hodges also argue against taking their land on grounds that the road is already safe and thus it is unnecessary to comply with AASHTO safety standards. The Hodges note that there is no evidence that any accidents have ever occurred on the road since it was built in the early 1960's.

We conclude that the State does not have to wait until an accident occurs before it can take the land for the purpose of complying with AASHTO safety standards. Moreover, the State must comply with AASHTO safety standards if it is to receive 95% federal funding.

**1.** See also: *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1074 (1st Cir.1980).

**2.** The condemnee will not be required to present evidence that the alternative is feasible before making such a challenge.

thus its determination of necessity was arbitrary. In light of the burden that the majority's approach places on the condemnor to establish the prima facie validity of its determination of necessity, only a few condemnees may ever be forced to present evidence.[3]

In my opinion, the court's opinion does not comport with the 1976 amendments to Alaska's statutory provisions relating to declarations of taking.[4] In amending the declaration of taking laws, the legislature clearly intended to (1) reverse the court's decision in *Arco Pipeline Co. v. 3.60 Acres, More or Less,* 539 P.2d 64 (Alaska 1975),[5] and (2) require condemnors to consider alternatives to proposed takings so that private harm could be minimized without sacrificing the interest of the public. There is no evidence, however, that the legislature intended its amendments to change the summary nature of a declaration of taking. The amendments do not require the use of any special investigatory procedures. I think it evident that the legislature intended that the condemnor would have primary responsibility for determining how far to go in investigating alternatives to a taking.

Under an approach which I believe to be more in accord with the legislature's intent, I would require that a condemnor, in order to establish the prima facie validity of its determination of necessity, must show only that the taking is "reasonably requisite and proper for the accomplishment of the purpose for which it is sought," *City of Fairbanks v. Metro Co.,* 540 P.2d 1056, 1058 (Alaska 1975), and that it made an effort to investigate alternatives so as to minimize private injury without "impairing the integrity and function of the project and without adding unreasonable costs to the project." *State v. 0.644 Acres, More or Less,* 613 P.2d 829, 832–33 (Alaska 1980). Once the condemnor has made this requisite showing the burden shifts to the condemnee to demonstrate by clear and convincing evidence that the condemnor arbitrarily failed to investigate a promising alternative or that the condemnor's conclusions about a particular alternative were irrational.

Applying this alternative analysis I conclude that the superior court erred in vacating the State's declaration of taking. The State presented substantial evidence that the taking was reasonably requisite and proper for the road project, and the State's witnesses testified that when it was discovered that the current project plan would necessitate the taking of land from the Hodges, the State planners considered the potential injury to the Hodges and ways of reducing it. The State concluded that the costs of acquiring land for lengthening the curve, of curving the relocated centerline so that the road would avoid the Soldotna Airport's aircraft parking apron (or the cost of land for a relocation of the parking apron), and of relocating a half-mile stretch of telephone line were substantial and outweighed the private injury that would result from the taking. This decision was not irrational on its face even if the State did not develop and use detailed cost estimates in making the determination or supporting it in court.[6]

---

**3.** The majority's approach will have an enormous practical impact. In order to protect themselves from legal challenges, condemnors will probably undertake elaborate pre-taking studies of alternatives. These developments will add greatly to the administrative costs of taking lands and will probably result in significant delays of needed projects.

**4.** See *State v. 0.644 Acres, More or Less,* 613 P.2d 829 (Alaska 1980).

**5.** In *Arco Pipeline,* we held that we would not examine the necessity of a taking under a declaration of taking unless the condemnee presented clear and convincing evidence of "fraud, bad faith, or some gross abuse of dis-

cretion" on the part of the condemnor. 539 P.2d at 72–73.

**6.** The State did not abuse its discretion by not considering widening the road on both sides. That alternative would have required the State to acquire land on the southern side of the road and relocate the telephone line. The Hodges presented no evidence that the costs of these actions were so low that it was unreasonable for the State not to investigate the alternative.

Moreover, in my opinion, the State has a valid point when it cites in support of its position the general state policy against widening both sides of a road. Unless the legislature provides otherwise, it seems to me that general

Once the prima facie validity of the State's determination of necessity had been established, the burden shifted to the Hodges to present evidence that contradicted either the State's claim that it had considered the potential injury to the Hodges and had investigated all reasonable alternatives, or the State's conclusions concerning the feasibility of various alternatives. The Hodges did not present such evidence.

For these reasons, I dissent from the majority opinion, and would reverse the judgment of the superior court.

policies formulated by administrative agencies should be presumed to be rational. The burden was on the Hodges to show that the widening policy was irrational, not on the State to show that it was rational.