Nancy J. HILLSTRAND, Appellant,

v.

CITY OF HOMER, Appellee.

No. S–13160.

Supreme Court of Alaska.

Oct. 30, 2009.

Ronald L. Baird, Anchorage, for Appellant.

Thomas F. Klinkner, Birch, Horton, Bittner & Cherot, Anchorage, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

A municipality sought land through eminent domain to expand its water treatment plant. The property owner objected to the taking because: it would close off an access route to her remaining property; the municipality had not dedicated replacement access in a binding way; and the municipality sought a fee simple interest, rather than an easement, in the portion of the land to be used as an undeveloped protective buffer for the plant. The landowner also sought an order directing the municipality to obtain final plat approval for the property by a specific date. The superior court granted the municipality's requested taking without specifying a deadline for the final plat. Because the superior court did not err in rejecting some of the landowner's objections as a matter of law and correctly left the remaining objections for consideration during the damages phase of the proceedings, we affirm the superior court's decision in all respects.

## II. FACTS AND PROCEEDINGS

### A. Facts

In 2005 the City of Homer determined it needed to expand its water treatment plant to meet federal drinking water standards and to increase capacity for future needs. The City wanted to construct a new building to house treatment-related facilities adjacent to its existing plant. Nancy Hillstrand owned in excess of one hundred acres in an adjoining parcel. The City sought to take roughly four acres of land in the southwest corner of Hillstrand's parcel.

The City planned to use the four-acre parcel for "the construction of a new building which will house required water treatment equipment, chemical storage, laboratory, and office space; access improvements; septic system; water treatment sludge dewatering facility; storm water treatment facilities; fencing; and adjustments to the raw water

pipeline from the ... Reservoir." The City also planned to create "vegetative non-disturbance buffers" on that parcel as a shield between the new facilities and Hillstrand's remaining property.

The western boundary of Hillstrand's property and the eastern boundary of the City's existing water treatment plant is a section-line, with adjoining thirty-three foot wide section-line easements on each property. A section-line easement is a statutorily-created public right-of-way owned by the State of Alaska.[1] The section-line easement on Hillstrand's property contains a road-way known as Carter Drive, providing access from Hillstrand's parcel to a City road called Skyline Drive. Skyline Drive crosses Hillstrand's property at its southeastern corner, but the majority of the parcel cannot be reached from this point due to topographic features. Hillstrand's property also abuts certain public rights-of-way along its southern edge.

A fence surrounding the City's existing water treatment facility extends to the section-line, blocking the section-line easement on the City's property. The City would like to completely fence the section-line easement when it acquires Hillstrand's four-acre parcel, cutting off Carter Drive and access to Skyline Drive from the western portion of Hillstrand's remaining property. The City planned to dedicate a replacement right-of-way, known as Nancy Place, running from Skyline Drive through another City-owned parcel to the southern edge of Hillstrand's remaining property.

### B. Proceedings

In December 2006 the City began negotiating with Hillstrand to acquire the parcel. The City later received preliminary approval from the City Planning Commission to acquire the parcel. The City placed a preliminary replat for the proposed taking on the Kenai Peninsula Borough Plat Committee's

---

1. *See* AS 19.10.010 ("A tract 100 feet wide between each section of land owned by the state, or acquired from the state, and a tract four rods wide between all other sections in the state, is

dedicated for use as public highways. The section line is the center of the dedicated right-of-way.").

agenda for September 2007, but Hillstrand requested it be removed. The City complied.

In January 2008 the City filed a complaint for condemnation, a declaration of taking, and the decisional document describing the need for the project and the chosen site. The City sought a fee simple interest in 4.014 acres of Hillstrand's property, described in the complaint by metes and bounds, and deposited $62,000 with the superior court as its estimate of just compensation for the taking.

Hillstrand filed her answer and a motion to dismiss the taking in March 2008. She asserted that the City had not complied with the platting requirements of AS 09.55.275 and thus details of replacement access to her remaining parcel had not yet been legally determined. She also asserted that both the City's plan eliminating access through Carter Drive (along the section-line easement) and its taking of a fee simple interest in the land to be used as a vegetative buffer were unnecessary and therefore impermissible. She requested that the City's action be dismissed or "remanded to the City for compliance with AS 09.55.275" and that she be awarded costs and attorney's fees.

In April 2008 the City submitted a revised preliminary replat to the Borough Plat Committee and requested an exception to the Borough's requirement that Carter Drive continue to be dedicated as a public right-of-way.[2] The Committee approved the preliminary replat on May 12, 2008, but rejected the City's request to eliminate Carter Drive.

The superior court heard oral argument on Hillstrand's motion to dismiss on May 23, 2008. At that time Hillstrand also sought a ruling that the City did not have authority to close off the section-line easement (Carter Drive). The City asserted that it was not taking the section-line easement and had not taken action to vacate it. The City conceded that if the Borough allowed it to close Carter Drive as a public right-of-way the City would do so, but stated that it did not seek a court ruling on the matter. The court ordered the take deed be amended to describe the taken parcel by reference to the approved preliminary plat rather than by metes and bounds, but otherwise denied Hillstrand's motion to dismiss. The court found that the City had authority and necessity for the taking and granted the City possession of the parcel.

Hillstrand moved for reconsideration, which the court denied without comment. The court then denied Hillstrand's request for costs and attorney's fees.

Hillstrand appeals.

## III. STANDARD OF REVIEW

 Hillstrand's arguments that AS 09.55.250 prohibits the City from taking a fee simple interest in the land to be used for a vegetative buffer and that AS 09.55.275 requires the City to obtain approval of a final plat of the taken property by a specific date present questions of statutory interpretation to which we apply our independent judgment, adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[3] Her arguments that the superior court erred in not ordering the City to decide whether it will close off Carter Drive access and to definitively describe the type of replacement access to be constructed also present questions of law under the eminent domain statute which we review de novo.[4] But in a condemnation under a declaration of taking, we will set aside the condemnor's decision regarding the taking's necessity only if it is " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' "[5] We use our independent judg-

---

**2.** The City sought an exception to a Kenai Peninsula Borough provision requiring that "[t]he streets provided on the plat must provide for the continuation or appropriate projection of all streets in surrounding areas and provide reasonable means of ingress for surrounding acreage tracts." Kenai Peninsula Borough Code (KPBC) § 20.20.030.

**3.** *Municipality of Anchorage v. Suzuki,* 41 P.3d 147, 150 (Alaska 2002) (quoting *Muller v. BP*

Exploration (Alaska) Inc., 923 P.2d 783, 787 (Alaska 1996)) (internal quotation marks omitted).

**4.** *Id.*

**5.** *State, Dep't of Transp. & Pub. Facilities v. 0.644 Acres, More or Less,* 613 P.2d 829, 833 (Alaska 1980) (quoting *Moore v. State,* 553 P.2d 8, 34 n. 12 (Alaska 1976)); *see also State, Dep't of Transp.*

ment in interpreting the rules of civil procedure relating to attorney's fees.[6] A trial court's award of attorney's fees is reviewed for abuse of discretion.[7]

## IV. DISCUSSION

### A. Eminent Domain Overview

The City commenced an action in eminent domain accompanied by a declaration of taking.[8] Condemnation under a declaration of taking proceeds in two phases.

In the face of objections to the taking, the superior court must determine whether the condemnor has legal authority to take property for the proposed use,[9] what kind of property interest may be taken,[10] and whether the taking is "by necessity for a public use or purpose in a manner compatible with the greatest public good and the least private injury." [11] The property owner may object to authority and necessity for the taking by filing a motion to dismiss under Civil Rule 72(h)(2)(A); but if the court finds that authority exists and the condemnor's reasoning is not arbitrary, title to the land, received upon filing the declaration of taking,[12] may not be divested.[13] A ruling on authority and necessity is a final judgment that may be appealed.[14]

The court then begins proceedings to determine just compensation for the property taken.[15] Just compensation may include compensation for a landowner's loss of access to the network of city streets because "an owner of abutting land has a right of access to and from a public street or highway." [16] The scope of this right "is limited to a 'right of reasonable access.' "[17]

### B. The Trial Court Did Not Err in Declining To Order the City To Complete a Final Plat or To Define the Parameters of Replacement Access to Hillstrand's Remaining Property.

Hillstrand moved to dismiss the City's taking "for lack of authority and necessity" pursuant to Rule 72(h)(2)(A). The superior court denied her motion, and she appeals that ruling on two distinct but related grounds. She argues that the court erred by not ordering the City to complete a final plat by a specific date under AS 09.55.275. She also argues that the court erred by not ordering the City to describe in its declaration of taking the type of replacement access it intended for the new Nancy Drive. She contends the court must compel these actions so the City cannot later avoid its obligation to compensate her for the loss or increased cost of access. The City argues that the superior court "correctly reserved the issue of access to the Remnant Parcel to the Borough plat approval process ... and the compensation phase of the eminent domain action."

The superior court did not err by refusing to order the City to complete a final

& Pub. Facilities v. 2.072 Acres, More or Less, 652 P.2d 465, 466 (Alaska 1982); Arco Pipeline Co. v. 3.60 Acres, More or Less, 539 P.2d 64, 68–69 (Alaska 1975).

6. See R & Y, Inc., v. Municipality of Anchorage, 34 P.3d 289, 300 (Alaska 2001) (citing Bobich v. Hughes, 965 P.2d 1196, 1197 (Alaska 1998) and D.L.M. v. M.W., 941 P.2d 900, 902 (Alaska 1997)).

7. Res. Invs. v. State, Dep't of Transp. & Pub. Facilities, 687 P.2d 280, 283 (Alaska 1984) (citing Badger Constr. v. State, 628 P.2d 921, 924 (Alaska 1981)).

8. See AS 09.55.240; AS 09.55.420–.460.

9. See AS 09.55.240; AS 09.55.430(1).

10. See AS 09.55.250.

11. See AS 09.55.430(7) & AS 09.55.460(b).

12. See AS 09.55.440(a).

13. See AS 09.55.460(b).

14. Alaska R. Civ. P. 72(h)(2)(E).

15. See AS 09.55.440(a); Alaska R. Civ. P. 72(h)(2)(A), (h)(3)-(6). The court appoints a master to hear evidence and determine the amount of compensation owed. Alaska R. Civ. P. 72(h)(3)(A); AS 09.55.310. The parties may obtain a jury trial on the compensation issue either by waiving appointment of a master or by appealing the master's award. AS 09.55.320; Alaska R. Civ. P. 72(h)(3)(B), (h)(5)-(6).

16. Triangle, Inc. v. State, 632 P.2d 965, 967 (Alaska 1981) (citing Annot., 42 A.L.R.3d 13 (1972)).

17. Id. (quoting B & G Meats, Inc. v. State, 601 P.2d 252, 254 (Alaska 1979)).

plat by a specific date. The platting statute, AS 09.55.275, does not require the condemning authority to replat affected properties at any specific point in the takings process, and Hillstrand's rights of replacement access will be appropriately considered in the later compensation proceedings.

Before 2004 AS 09.55.275 expressly required a condemnor to obtain preliminary approval of a replat before acquiring land through eminent domain:

No agency of the state or municipality may acquire property located within a municipality ... which results in a boundary change unless the agency or municipality first obtains from the municipal platting authority preliminary approval of a replat showing clearly the location of the proposed public streets, easements, rights-of-way, and other taking of private property. Final approval of replat shall be similarly obtained.... The platting authority shall treat applications for replat made by state or local governmental agencies in the same manner as replat petitions by private landowners.[18]

In 2002 we decided *Municipality of Anchorage v. Suzuki*,[19] in which landowners argued that the municipality taking their property was required to obtain preliminary replat approval because the condemnation of an easement across their land was a "boundary change" within the meaning of AS 09.55.275.[20] We agreed and affirmed the superior court's ruling that the municipality was required to apply for a replat "in a short period of time."[21]

In 2004 the legislature amended AS 09.55.275 to read as follows:

An agency of the state or municipality acquiring property in fee that results in a boundary change ... shall conform to this section by obtaining preliminary approval of a replat showing clearly the location of the proposed public street or other acquisi-

tion of property. The platting authority may establish applicable review procedures and standards for a replat made for the purpose of a right-of-way acquisition or condemnation. Neither the adequacy of the municipal replat process or standards, if any, nor the failure of a municipality to follow its own replat process and standards shall deprive the state of the authority to exercise its power of eminent domain. Final approval of replat shall also be obtained.[22]

The legislature eliminated the language making preliminary replat approval an express precondition to a taking. Although obtaining preliminary and final replat approval is still mandatory, it is not a precondition for a taking and there is no express deadline for final replat approval.

■ The legislature's stated purpose in revising AS 09.55.275 was:

to confirm the municipal role in eminent domain proceedings, including the right of municipalities to regulate remnant parcels, while at the same time clarifying that that role is not intended to require the same substantive review or procedures for review of replats for the acquisition of property by the state or a municipality as required in replats for private landowner subdivisions or zoning reviews.[23]

Considering together: (1) AS 09.55.275's stated purpose of facilitating municipal land use regulation; (2) the 2004 revision's purpose of diminishing procedural hurdles to the condemnor's ability to take property; and (3) the elimination of language requiring the condemnor to obtain replat approval before taking property, we conclude that AS 09.55.275 does not require the condemnor to obtain final replat approval at a specific point in the taking process. The superior court

---

18. AS 09.55.275 (2003); ch. 96, § 2, SLA 1975.

19. 41 P.3d 147 (Alaska 2002).

20. *Id.* at 149.

21. *Id.* at 150. The superior court had found that applying the replat requirement retroactively

would cause undue hardship by jeopardizing funding and raising costs and thus did not dismiss the taking. *Id.*

22. AS 09.55.275; ch. 32, § 2, SLA 2004.

23. Ch. 32, § 1, SLA 2004.

therefore did not err in refusing to order the City to obtain plat approval by a specific date.

Hillstrand argues that the superior court: (1) must order the City to obtain final plat approval by a specific date so it cannot avoid dedicating replacement access to the remnant parcel; and (2) should have ordered the City to definitively describe the type of replacement access to be constructed. She contends that if the City requires her to construct a paved road, the cost to her will be much greater than if the City allows her to maintain only a dirt path. But the issues of replacement access to the remnant parcel are more appropriately considered in subsequent proceedings to determine just compensation.

■ If the taking eliminates reasonable access to the road network, then this aspect of the taking will be compensable and an element of the compensation owed to Hillstrand.[24] If Hillstrand still retains reasonable albeit more circuitous access despite the taking, she will not be compensated for this inconvenience.[25] What replacement access Hillstrand may have and whether her access to city streets is reasonable following the taking are more appropriately considered at compensation proceedings than in the current proceedings to determine the City's authority and necessity for the taking.[26]

## C. The Superior Court Did Not Err in Declining To Rule that the City Cannot Close Carter Drive.

■ Hillstrand argues that the superior court should have barred the City from closing off Carter Drive access. She acknowledges that the Borough and the State have opposed closing Carter Drive and have required the City to dedicate it as a public right-of-way. But Hillstrand fears that if the Borough and State later agree to close Carter Drive she will be deprived of Skyline Drive access without compensation for the loss. She therefore sought a definitive answer on Carter Drive's status: she wanted the court to either rule that the City cannot block access or order the City to determine whether the Borough and State will consent to closing it.

■ The superior court did not err in declining Hillstrand's request because access to Carter Drive is not an element of the City's taking. A section-line easement is a statutorily-created public right-of-way owned by the State[27] and is a property interest distinct from the condemned portion of Hillstrand's property.[28] The City's complaint for condemnation and its declaration of taking proposed condemning Hillstrand's fee interest in the four-acre parcel on which the section-line easement sits, not the easement itself. The City cannot vacate the section-

**24.** *Triangle*, 632 P.2d at 967 (citing *B & G Meats*, 601 P.2d at 254).

**25.** *Id.* at 968.

**26.** Hillstrand relies on two cases from other jurisdictions, *Peebles v. Canal Authority*, 254 So.2d 232 (Fla.App.1971), and *Gluckman v. New York*, 37 A.D.2d 870, 325 N.Y.S.2d 99 (1971), but these cases actually support the City's position. In *Peebles* and *Gluckman*, the condemnor seized property and informally promised the landowners access through the taken parcel to, respectively, lakefront and an industrially-zoned district. 254 So.2d at 233, 37 A.D.2d at 870–71, 325 N.Y.S.2d 99. The compensation awarded in each case was calculated on the assumption that the landowner would have the promised access. *Peebles*, 254 So.2d at 233; *Gluckman*, 37 A.D.2d 870–71, 325 N.Y.S.2d 99. The reviewing courts vacated the awards and remanded for recalculation of compensation because, as the *Peebles* court explained, "[P]rivileges in the property taken ... the enjoyment of which is not compatible with the exercise of the title taken ... by the condemning authority, cannot be considered in awarding compensation unless they are formally established by the condemnation proceeding." 254 So.2d at 233. Neither decision required the condemnor to legally dedicate the access promised; they held merely that a non-binding promise of a valuable access route did not diminish the amount of compensation owed because the condemnor could break the promise at any time. *See Peebles*, 254 So.2d at 232; *Gluckman*, 37 A.D.2d 870, 325 N.Y.S.2d 99.

**27.** *See* AS 19.10.010.

**28.** *0.958 Acres, More or Less v. State*, 762 P.2d 96, 100 (Alaska 1989) ("[W]hen the state condemns the fee interest in land in which it owns a section line easement ... it owes no compensation for the loss of access to the easement, since no preexisting right was taken.").

line easement without following specific administrative procedures,[29] and the State, not the City, has authority to decide whether a section-line easement may be vacated.[30] Despite the City's stated desire to close off access to Carter Drive, its declaration of taking and its decision not to undertake proceedings under 11 AAC 51.065 make clear that closing Carter Drive is not at issue in this proceeding.[31] The superior court did not err in declining to decide whether closing Carter Driver is necessary to the City or whether the Borough and State ultimately will consent to closing it.

### D. The Superior Court Did Not Err in Approving the Taking of Land in Fee for a Vegetative Buffer.

The City's plan for the parcel taken from Hillstrand includes "vegetative non-disturbance buffers" fifty feet deep on the northern, eastern, and southern boundaries of the taken parcel. During the initial purchase negotiations for the parcel, Hillstrand requested a 110–foot buffer between the taken parcel and her remainder parcel. The decisional document notes that Hillstrand's "stated purpose of requesting non-disturbed areas on the north, east and southern boundaries is to buffer the remaining parcel from activities that occur at a public water treatment plant." The City rejected Hillstrand's request to take only 2.54 acres in fee and the remaining land for the buffer as an easement; the City instead decided to take the entire 4.014 acres in fee.

The superior court ruled that the City had legal authority to take the buffer area in fee and that the buffer area was necessary to the City's project. Hillstrand argues that the court erred because: (1) the depth of the buffer, fifty feet, is arbitrary; (2) the City's decision to take a fee interest rather than an easement for the buffer is arbitrary; and (3) land for a vegetative buffer may not legally be taken in fee under AS 09.55.250.

### 1. The buffer's size is not arbitrary.

 When a condemnor takes property with a declaration of taking, the declaration must include "a statement that the property is taken by necessity for a project located in a manner that is most compatible with the greatest public good and the least private injury."[32] Upon the property owner's objection,[33] the court may divest the condemnor of title to the property if it finds this is not so.[34] "Striking the ultimate balance is ... a decision to be made by the condemnor. A court should not substitute its judgment for that of the condemnor, but may set aside the condemnor's decision if it is 'arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law.'"[35] "The [condemnor's] determination of the least private injury and the greatest public good must be a rational one, and ...

---

**29.** 11 Alaska Administrative Code (AAC) 51.025(b) (2008) ("Whether reserved by the department [of natural resources] or granted to the state, a section-line easement continues to exist unless and until it is vacated under 11 AAC 51.065, regardless of whether that easement is in use."). Hillstrand argues that condemnation of property automatically extinguishes all easements in the property, but she cites only cases involving easements owned by private parties. *See Thomas Gang, Inc. v. New York*, 19 A.D.3d 861, 797 N.Y.S.2d 583 (2005); *Wolff v. Sec'y of the S. Dakota Game, Fish & Parks Dep't*, 544 N.W.2d 531, 536 (S.D.1996). Even if that rule were applicable to state-owned easements generally (an issue we do not address), 11 AAC 51.025 supplants it with respect to section-line easements.

**30.** *See* 11 AAC 51.065 (establishing procedures and standards for decision by Department of Natural Resources to vacate section-line easements).

**31.** We note, however, that in the event the State vacates the section-line easement and the City closes Carter Drive after compensation in these proceedings, Hillstrand is not without a remedy. She could then sue for compensation for the taking of her access to the road system. *Triangle*, 632 P.2d at 967.

**32.** AS 09.55.430(7).

**33.** AS 09.55.450(a).

**34.** AS 09.55.460(b).

**35.** *0.644 Acres, More or Less*, 613 P.2d at 833 (quoting *Moore* 553 P.2d at 34 n. 12).

a decision must be considered arbitrary where the condemnor has failed to consider all important, relevant factors in making a determination."[36] Hillstrand does not object to the project as a whole, but contends that the buffer's depth and the City's decision to take the underlying land in fee are arbitrary.

The City's decisional document does not directly explain why the proposed buffer is fifty feet deep, and thus its depth may appear arbitrary when considered in isolation. When considered in the context of the entire parcel, especially in light of Hillstrand's original request for a buffer depth of 110 feet to preserve the land's appearance from the road and to minimize light pollution from the facility, the justification becomes more apparent.

The City's decisional document states that the City originally intended to take a larger parcel of land to conform to zoning regulations designed to protect the watershed in which the parcel sits. These regulations require that no parcel less than 4.5 acres be created and that total impermeable surfaces not exceed 4.2 or 6.4 percent of the lot area.[37] Although the City's water utility is exempt from these requirements,[38] the City nonetheless stated a desire to conform to them, a reasonable objective for an entity concerned with and dependent upon watershed health. But due to Hillstrand's concerns about the size of the parcel to be acquired, "the City reduced the requested take to what is considered minimum (4.014 acres)." Although the decisional document does not directly address the buffer's depth, it is a function of the size of the parcel taken, the necessity of which is adequately supported in the record.

### 2. The City's decision to take land in fee for the buffer is not arbitrary.

Hillstrand also argues the City's decision to take land for use as a vegetative buffer in fee, rather than by easement, is arbitrary.

A condemnor must consider all "important, relevant factors in making its determination."[39] Hillstrand desired a buffer to minimize the impact of the plant's activities on her remnant parcel (an aim equally well-served by a fee or an easement). In its decisional document the City observed that Hillstrand sought an easement that would exclude permanent structures but allow future roads to be built in the buffer. It also observed that maintaining an easement on private lands would place an additional burden on the City, noting that Hillstrand demanded the City bear the cost of maintaining the buffer and concluding "the only practical and cost-effective way the City can adequately control development within the buffer areas is to own the buffers." The City therefore considered all the relevant, important factors: the long-term cost and burden of each alternative[40] and the extent to which each alternative would further its and Hillstrand's primary goals[41]—respectively, controlling development and protecting the remnant parcel from disturbances. It was not error for the superior court to conclude that the City's decision to take the buffer area in fee is not arbitrary.

---

**36.** *2.072 Acres, More or Less,* 652 P.2d at 466–67 (quoting *0.644 Acres,* 613 P.2d at 832–33) (internal citation omitted).

**37.** Homer City Code § 21.40.070(a), (c).

**38.** Homer City Code § 21.40.070.

**39.** *2.072 Acres,* 652 P.2d at 467.

**40.** Hillstrand argues the City "never estimated the value of an easement even in a preliminary fashion." The cost of an easement depends on the costs of both acquiring and maintaining it. Given Hillstrand's demand for the same amount of compensation for the taking of an easement as

for the taking of fee and the possibility of future development adjacent to those lands, the City's decision is not unreasonable.

**41.** Hillstrand also argues the City "overlook[ed] the benefits" she might obtain if it took only an easement. However, the only benefit she notes is that she might use the area "much the same way as a yard." Given the large amount of undeveloped property in the surrounding area that could be enjoyed this way and the limited activity consistent with the City's use that could take place in the buffer area, the practical benefit to Hillstrand of the City taking an easement rather than a fee is minimal in this regard. The City's failure to expressly mention this factor does not render the City's decision arbitrary.

**3. Alaska Statute 09.55.250 does not prohibit the City from taking a fee interest in land to be used as a vegetative buffer in this context.**

Hillstrand argues that the superior court erred in concluding that the City's taking of the land in fee to be used for a vegetative buffer, rather than restricting the City to an easement, complied with AS 09.55.250. She contends that AS 09.55.250, which limits the property interest a condemnor may take for certain purposes, does not allow land to be taken in fee for the buffer.

Alaska Statute 09.55.250 provides, in relevant part:

> The following is a classification of the estates and rights in land subject to be taken for public use:
> (1) a fee simple, when taken for public buildings or grounds, or for permanent buildings, for reservoirs and dams and permanent flooding occasioned by them, or for an outlet for a flow, or a place for the deposit of debris or tailings of a mine . . . ;
> (2) an easement when taken for any other use. . . .

Although public buildings to house water treatment facilities will be erected on the taken parcel, Hillstrand contends that because no buildings or other structures will be erected and no public activities allowed on the portion used for a vegetative buffer, that portion of the parcel is not taken "for public buildings or grounds"; therefore, she argues, the City may take only an easement.

Hillstrand relies on our decision in *Williams v. City of Valdez*.[42] There we stated that "statutes authorizing the exercise of eminent domain are to be strictly construed against the condemnor," and applied that principle to "statutory declarations with respect to the extent of the interest which is to be acquired."[43] In *Williams* we interpreted the phrase "an outlet for a flow" in AS 09.55.250 to refer "only to the flow of tailings or refuse matter from mines" in light of the text both of that provision and of AS 09.55.240(5).[44] We thus concluded the city did not have authority to take a fee in land used for a drainage ditch unrelated to mining.[45] Hillstrand essentially argues that we should not only strictly construe AS 09.55.250 as to the type of use for which a fee may be taken, as we did in *Williams*, but that we also should divide a proposed use into various components and determine whether each individual component is a use enumerated in AS 09.55.250 for which a fee may be taken.

We decline to adopt this approach because the text of AS 09.55.250 does not require it. It permits the taking of "a fee simple, when taken for public buildings or grounds."[46] This provision might be interpreted so that land is used "for public buildings" only when it lies directly underneath the four corners of the building itself; all adjacent lands would then have to be taken as easements. A more natural interpretation is that land is used "for public buildings" when it supports either the building or subsidiary features reasonably necessary to serve its purpose, such as access, parking, landscaping, space for light and air, and security. The former interpretation gives rise to several problems the latter avoids: irregularly-shaped takings, interference with the condemnor's public buildings due to less-than-full ownership of adjacent land, and the difficulty of selling the taken parcel should the public use cease at some point in the future.[47]

---

42. 603 P.2d 483 (Alaska 1979).

43. *Id.* at 491 (quoting 3 J. SACKMAN, NICHOLS ON EMINENT DOMAIN § 9.2(1), at 9–15 (1978 & 1979 Supp.) (internal quotation marks omitted)).

44. *Id.*

45. *Id.*

46. AS 09.55.250.

47. Selling taken parcels might be more difficult if condemnation of a fee were limited to land directly underlying the edifice because under the law of eminent domain, ownership of a condemned easement generally reverts to the original owner if the public use for which it was condemned ceases. 3 J. SACKMAN, NICHOLS ON EMINENT DOMAIN § 9.04(3)(c)(i) (3d ed. 2006) ("The mere discontinuance of a public easement does not necessarily establish a right to reverter. As a rule, if the public use is subsequently discontinued or abandoned, the public easement is extinguished, and the possession of the land reverts to the owner of the fee free from any rights in the public.").

Although we know of no decisions directly addressing the question posed here,[48] we observe that when determining what kind of interest in land may be condemned, courts scrutinize the proposed use as a whole rather than dividing it into individual components. For example, the North Dakota Supreme Court ruled that a city had obtained a fee interest in land for an airport under a statutory provision identical to AS 09.55.250(1) because an airport "falls within [the statute] as 'public buildings or grounds,' for which the statute expressly authorized acquisition of a fee simple."[49] The California Supreme Court ruled that former California Civil Procedure Code section 1239, which permitted taking a fee for "reservoirs and dams, and permanent flooding occasioned thereby,"[50] authorized the city of Los Angeles to take land in fee for a subterranean reservoir without separately analyzing whether a fee might be taken for a main feature of the project, a tunnel draining and filtering the saturated soil and delivering the water to the city's supply pipes.[51] That an airport is comprised of runways as well as hangars and terminals, and that a reservoir contains land used for purposes other than actual water storage, has not led courts to limit the taking of a fee to only certain components of those projects.

In light of the text of AS 09.55.250, the approach indicated in the decisions of other courts, and the policy implications involved, we hold that when a condemnor takes land for a public building, land may be taken in fee for subsidiary features, so long as those features are reasonably necessary to accomplish the condemnor's purpose.[52]

We recognize that in some cases a challenged project feature may be a use so distinct from the building itself that the land taken for it cannot be said to be a "subsidiary feature" of a public building, but rather is an independent use.[53] In this case, however, the vegetative buffer is closely intertwined with the function and purpose of the water treatment plant. It protects the health of the watershed on which the City's drinking water depends by maintaining the taken parcel's proportion of impermeable surface at the recommended level. It also minimizes the negative effects on adjacent lands of an unsightly industrial use. Although these concerns may seem overstated given the remnant parcel's current undeveloped state, they may well prove prescient should further subdivision and development take place in

48. The California Supreme Court encountered this issue in *Crockett Land & Cattle Co. v. American Toll Bridge Co. of California*, 211 Cal. 361, 295 P. 328 (1931), when a man whose land was condemned for construction of the Carquinez Bridge argued he had the right to occupy land underneath the span of the bridge because under former Cal.Code Civ. P. § 1239, which permitted the taking of a "fee simple, when taken for public buildings or grounds, or for permanent buildings," the condemnor was permitted to take only an easement for that land. The court did not address this question, holding that regardless of whether a fee or easement had been taken the bridge owner was entitled to exclusive occupancy of the land. *Crockett Land & Cattle Co.*, 295 P. at 330.

49. *State ex rel. Bd. of Univ. & Sch. Lands v. City of Sherwood*, 489 N.W.2d 584, 589 (N.D.1992) (citing N.D. Rev.Code § 32–1503(1) (1943)).

50. Former Cal.Code Civ. P. § 1239 permitted taking of a "fee simple, when taken for public buildings or grounds, or for permanent buildings, for reservoirs and dams, and permanent flooding occasioned thereby...." It has since been superseded by Cal.Code Civ. P. § 1240.110, which provides "[e]xcept to the extent limited by statute, any person authorized to acquire property for a particular use by eminent domain may exercise the power of eminent domain to acquire any interest in property necessary for that use...." 1975 Cal. Stat. 3413.

51. *City of Los Angeles v. Pomeroy*, 124 Cal. 597, 57 P. 585, 587, 591 (1899). The city sought to condemn a 315–acre tract in the San Fernando Valley, where the Los Angeles River flowed as a subterranean stream until surfacing further south, closer to the city. The city sought to build an underground dam and create a subterranean reservoir, drawing water from the saturated soils using an underground tunnel and then piping the water to the city for municipal use. *Id.* at 586–87.

52. We express no opinion on the meaning of the term "grounds" in AS 09.55.250's authorization of a fee for "public buildings or grounds."

53. Thus a stretch of highway leading to an airport may not be a subsidiary feature of the airport itself, but rather an independent use; the taking of land for the highway would usually need to independently satisfy statutory requirements, including that of AS 09.55.250.

the area. A buffer of this sort may not be a subsidiary feature reasonably necessary to carry out the purpose of every public building, but we are satisfied that it is for the City's water treatment plant. It was not error to allow the City to take the entire 4.014 acre-parcel in fee.

### D. The Superior Court Did Not Err in Declining To Award Hillstrand Attorney's Fees.

Hillstrand argues that she was entitled to an award of attorney's fees under subsections (k)(1) and (k)(5) of Civil Rule 72. These provisions of Rule 72 respectively provide that costs and attorney's fees incurred by a defendant in eminent domain proceedings must be assessed against the condemnor if "the taking of the property is denied"[54] or if "allowance of costs and fees appears necessary to achieve a just and adequate compensation of the defendant."[55] The superior court denied Hillstrand's motion for costs and fees.

Hillstrand argues that because (1) the court ordered the City to amend the declaration of taking to incorporate the preliminary plat description in lieu of the metes-and-bounds description and (2) the platting process "will result in dedication of new access to the remainder parcel and in rejection of the City's plan to close off another right-of-way," "the City's taking as originally proposed was denied."

The superior court did not abuse its discretion in denying Hillstrand attorney's fees. It ruled favorably to her only in ordering the City to amend its declaration of taking to describe the taken parcel by reference to the approved preliminary plat. This amendment resulted in no substantive change to the scope of the taking approved by the court.[56] Although the Borough refused the City's request to fence off Carter Drive, that access was not an element of the taking and was therefore not denied by the court. The court rejected Hillstrand's plea to limit part of the taking to an easement, Hillstrand did not obtain any greater right to replacement access than the City planned to give her at the action's commencement, and the court granted the City's motion for possession. None of Hillstrand's objections were found valid by the trial court, and no part of the taking was denied. It was therefore not an abuse of discretion to deny her attorney's fees under Rule 72(k)(1).

Hillstrand argues that she is entitled to attorney's fees under Rule 72(k)(5) because replacement access was important to her and her fees "incurred in forcing the City to plat the property were 'necessary to achieve a just and adequate compensation.'" However the record makes clear that the City originally intended to provide replacement access to the remnant parcel, and were it not for Hillstrand's objections the City would have submitted a preliminary plat for approval earlier. Accordingly the superior court did not err in concluding that awarding Hillstrand attorney's fees was not "necessary to achieve a just and adequate compensation."

## V. CONCLUSION

The superior court's decision is AFFIRMED.

---

54. Alaska R. Civ. P. 72(k)(1).

55. Alaska R. Civ. P. 72(k)(5).

56. The superior court ordered the amendment because "it's appropriate that the take deed be expressed in the modern vernacular rather than the archaic vernacular." The court stated: "[Hillstrand] has asked me to say that I'm not approving something other than what the plat approves and that's, of course, true so I'll make that express. That's a part of the process that I am a stranger to and I take no position." The declaration of taking's description of the property need only be "sufficient for the identification of it," AS 09.55.430(3), so that the court may determine the authority for and necessity of taking it. Proceedings before the Plat Committee may affect rights in the taken and remnant parcels in some way—*e.g.*, regarding utility easements or street access-regardless of whether the taken parcel is described by metes and bounds or by reference to the preliminary plat. The form of the description has no effect on the scope of the taking at issue in this stage of the eminent domain proceedings.