UNITED STATES v. 348.62 ACRES OF LAND IN
ANCHORAGE RECORDING DIST. et al.

No. A–2709, Civil.

District Court of Alaska. Third Division. Anchorage.

Oct. 23, 1943.

352

Charles J. Clasby, Acting Sp. Atty., of Fairbanks, for petitioner and for plaintiff.

Almer J. Peterson and George Grigsby, both of Anchorage, for Julius Chapman Morris and his wife, defendants.

HELLENTHAL, District Judge.

This matter comes before the Court on plaintiff's petition, wherein the plaintiff asked the Court for an order declaring that title to Lot 3 and the Northeast quarter of the Southeast quarter, Section 6, Township 13 North, Range 3 West, Seward Meridian, Alaska, has never been divested from petitioner and that the defendants J. C. Morris and Edythe Morris, his wife, take nothing by virtue of the award made for the same by the jury in this action.

In the petition it is alleged that the plaintiff is the sovereign holding full fee title to all lands now a part of the

public lands of the United States of America; that on the 29th day of April, 1939, the President of the United States, by Executive Order Number 8102, temporarily withdrew from settlement, location, sale, entry and all forms of appropriation Lot 3 and the Northeast quarter of the Southeast quarter of Section 6, Township 13 North, Range 3 West, Seward Meridian, and placed said lands under the control and jurisdiction of the War Department for use as a military reservation; that on the 29th day of April, 1939, the lands herein involved were not embraced in any lawful homestead or desert-land entry and were not embraced in any valid settlement then made and being maintained and perfected pursuant to law; that on and after the 29th day of April, 1939, said lands were under the jurisdiction of the Secretary of War; and the acts of the Department of Interior in allowing an entry thereon and issuing a patent thereto were in error, without jurisdiction and effect and constitute no valid title in the entryman, J. C. Morris. That the defendants herein are the persons who entered said lands, and that there are no rights of other persons affected.

The record shows that this tract of land which had been reserved for townsite purposes was, on August 22, 1938, thrown open for entry by Executive Order 7961, which order was received in the Anchorage Land Office on October 20, 1938; that on November 2, 1938, Joseph Lawrence Freeman duly and regularly filed application for this land, Serial No. 09434, and paid the sum of $14.86 with said application. That on the same date, November 2, 1938, the defendant, Julius Chapman Morris, duly and regularly made and filed an application for said land in the U. S. Land Office, Serial No. 09435 and paid the Land Office the sum of $14.86, at which time he also filed his Hot Springs affidavit and ex-service record notations. On November 4, 1938, the Land Office issued receipt No. 3299909 to Freeman and receipt No. 3299911 to Morris. That on November 8, 1938, Freeman filed affidavit of witness re Hot Springs. That on November 17, 1938, Dr. Gerald Thomas Smiley duly and regularly made application for said land in

the U. S. Land Office, Serial No. 09545 and paid $14.86 to said Land Office and filed the Hot Springs affidavit. That on November 18, 1938, receipt No. 3299946 was issued to Smiley. That Executive Order 8102 was issued April 29, 1939. That on May 17, 1939, the Land Office in Anchorage notified Morris, Freeman and Smiley that their applications were being treated as though filed simultaneously and that a drawing would be held on June 5, 1939, to determine by lot which entry would be allowed. That the Anchorage Land Office received Executive Order 8102 from the General Land Office on June 1, 1939. That a drawing was held in the Anchorage Land Office on June 5, 1939, at which drawing the defendant Morris was successful and his entry was then allowed. That the defendant Morris did not establish actual residence on the ground until December 5, 1939. That patent to said land was granted to defendant Morris on October 20, 1941.

A stipulation was entered into between the attorney for the plaintiff and the attorneys for the defendants which provides that "in view of the possibility that the petitioner will attack the title of the defendants to Lot 3 and the Northeast Quarter of the Southeast Quarter of the property in this proceeding being condemned" it is stipulated and agreed that if the Court should hold that the defendants have title to Lot 2 and that the remaining portion was never divested from the United States, then for the purpose of awarding the just compensation ascertained by the verdict, the Court may consider the value of Lot 2 as being sixty-five per cent of the value of the entire tract, exclusive of improvements by way of buildings and structures, and, further, that all improvements by way of buildings and structures are located on Lot 2 and that the value thereof, as found by the special verdict sought under special instructions by the Court, may be added to the sixty-five per cent allocation of the value of the land, as hereinabove set forth. The jury, by their verdict found all of the land and the improvements to be of the value of $8,000, and found the value of the improvements to be $2,750. So, the total value of the land was

found to be $5,250, sixty-five per cent of which is to be awarded to the defendants for Tract 2 and thirty-five per cent or $1,837.50 is to be considered the value of the property involved.

This reserve was made under the Act of June 25, 1910, Section 2 of which provides: " *   *   *   that there shall be excepted from the force and effect of any withdrawal made under the provisions of this Act all lands which are, on the date of such withdrawal, embraced in any lawful homestead or desert-land entry theretofore made, or upon which any valid settlement has been made and is at said date being maintained and perfected pursuant to law * * *". 43 U.S.C.A. § 142.

Joint Resolution of June 12, 1930, 43 U.S.C.A. § 186, provides: " *   *   *   That hereafter, for the period of ten years following February 14, 1930, on the opening of public or Indian lands to entry, or the restoration to entry of public lands therefore withdrawn from entry, such opening or restoration shall, in the order therefor, provide for a period of not less than ninety days before the general opening of such lands to disposal in which officers, soldiers *   *   *   shall have a preferred right of entry under the homestead or desert land laws, if qualified thereunder, except as against prior existing valid settlement rights and as against preference rights conferred by existing laws or equitable claims subject to allowance and confirmation *   *   *."

Executive Order 7961, lifting the reserve and making the land in question subject to entry, provides: " *   *   * the vacant, unreserved public lands in the areas released from such withdrawal shall be open to entry, under the homestead laws applicable to Alaska, by qualified ex-service men under the terms and conditions of said resolution and the regulations issued pursuant thereto, for a period of ninety-one (91) days beginning with the sixty-third day from and after the date hereof;  *   *   *." (Dated August 22, 1938).

Executive Order No. 8102, which created a temporary reservation of the land in dispute and placed it under the control and jurisdiction of the War Department, provides that said withdrawal is by virtue of the authority vested by the Act of June 25, 1910, as amended, and subject to all valid existing rights.

It, therefore, becomes necessary to determine whether the rights acquired by the defendants constitute a valid existing right, if this expression is broader than the restriction placed in the Executive Order by the Act of June 25, 1910, which Act provides that no withdrawals can affect lands embraced in any lawful homestead or desert land entry theretofore made.

If the defendant Morris had made a lawful homestead entry under the restriction of that Act, or if the defendant Morris had a valid existing right under the Executive Order 8102, then the petitioner cannot prevail. It, therefore, becomes essential to determine, first, what constitutes a lawful homestead entry, and, second, what is a valid existing right.

Since the Act of June 25, 1910, restricts the right of the executive in making withdrawals and excludes from said withdrawals all lands embraced in any lawful homestead entry, we should determine what is meant by a "lawful homestead entry".

Chotard et al. v. Pope et al., 25 U.S. 586, 588, 6 L.Ed. 737: " * * * The term entry, as applied to appropriations of land, was probably borrowed from the state of Virginia, in which we find it used in that sense, at a very remote period. Many cases will be found in the reports of the decisions of this court, in which the title to western lands were drawn in question, which will show how familiarly and generally the term is used by court and bar. Its sense, in the legal nomenclature of this country, is now as fixed and definite as that of many terms borrowed from the common law. It means, that act by which an individual acquires an inceptive right to a portion of the unappropriated

soil of the country, by filing his claim in the office of an officer known, in the legislation of several states, by the epithet of an entry-taker, and corresponding very much in his functions with the registers of land-offices, under the acts of the United States. * * * " Further on in the same case: " * * * In the act of the 3d March 1817 * * *, entitled 'an act allowing further time for entering donation rights' * * * that the sense in which the term entry is used, is that of filing a claim with the register of the land-office. * * * "

■ ·McCune v. Essig, C.C., 118 F. 273, 276: "A 'homestead entry' * * * is the initial step taken in the land office towards acquiring ownership under the homestead law, and precedes the performance on the part of a homestead claimant of the conditions of residence upon and improvement of the land, which constitute the real consideration for the transfer of the title, and which are conditions precedent to the vesting of title in the homestead settler."

■ Indian Cove Irr. Dist. v. Prideaux, 25 Idaho 112, 136 P. 618, 620, Ann.Cas.1916A, 1218: " 'Entryman' [means] one who enters upon public land with intent to secure an allotment under the homestead, mining, or other laws."

Dealy v. United States, 152 U.S. 539, 544, 14 S.Ct. 680, 682, 38 L.Ed. 545: It is common to speak of an entry of land under the homestead law, meaning thereby, not a mere preliminary application, but the proceedings as a whole, a complete transfer of title; and it is so used in an indictment under Rev.St. Sec. 5440, 18 U.S.C.A. § 88, charging a conspiracy to defraud the United States of title to land, said land being land of the United States, "upon an entry."

■■ It is apparent, however, that in the Statute under consideration, it refers to the term "entry" as an inceptive right rather than a complete transfer of title. Homestead entries are generally made under Section 162, Title

43, of the United States Code Annotated. However, there are many cases, as the present case, in which special Acts of Congress give special privileges and provide for special procedure, and, therefore, if entry is made under these Statutes, Section 162 is supplemented.

■ The matter of homestead entry was before the court in the case of McLaren v. Fleischer, 181 Cal. 607, 185 P. 967, 969, affirmed on certiorari to the Supreme Court of the United States, 256 U.S. 477, 41 S.Ct. 577, 65 L.Ed. 1052, in which case the California court says:

"What constitutes an entry was laid down in Hastings, etc., Co. v. Whitney, 132 U.S. 357, 10 S.Ct. 112, 33 L.Ed. 363, Mr. Justice Lamar writing the opinion: 'Under the homestead law three things are needed to be done in order to constitute an entry on public lands: First, the applicant must make an affidavit setting forth the facts which entitled him to make such an entry; second, he must make a formal application; and, third, he must make payment of the money required. When these three requisites are complied with, and the certificate of entry is executed and delivered to him, the entry is made—the land is entered.'

"See, also, Whittaker v. Pendola, 78 Cal. 296, 20 P. 680; Northern Pac. Ry. Co. v. Nelson, 22 Wash. 521, 61 P. 703.

" * * * Section 2290, it will be observed, does not require the applicant to do anything more than the plaintiff herein had done in order to enter the land; that is to say, to make, subscribe, and file in the proper land office the affidavit required by that section, and to pay the amount of money necessary to enter the quantity of land he applies for. When this is done his right is complete. The statement in the opinion of Mr. Justice Lamar which seems to imply that the entry is not complete until the officials execute a certificate of entry to him is not warranted by the statute. * * * "

■ Daniels v. Wagner, D.C.Or., 1912, 194 F. 973, affirmed, 1913, 9 Cir., 205 F. 235, 125 C.C.A. 93: Rights ac-

quired by entry or application. A qualified entryman, who enters public lands with intent to acquire title, has a vested right of which he can only be deprived by failure to comply with the law.

■ Christie v. Great Northern R. Co., 9 Cir., 1922, 284 F. 702: "As between conflicting claims to public lands, he whose initiation is first in time, if adequately followed up, is deemed first in right, and, if his claim is finally approved, his right relates back to the date of its initiation to the exclusion of any intervening claim."

The petitioner in his brief contends that an allowance of the entry by the Land Office is necessary to its validity, and, in support thereof cites the following cases:

Bumpers v. Holloway, 1921, 48 L.D. 269. In this case two applications were received in the same mail and it was held that the application that was first entered on the books was first in time. Allowance of entry was not mentioned in this case.

In re Otto F. Verch, 1929, 52 L.D. 693. This case holds that the pendency of an application to make homestead entry does not preclude like applications by others for the same land, and if the first application be withdrawn or rejected for any reason, any other pending applications will be recognized in the order of time that they are filed. There is no express mention of an order allowing an application.

United States v. Ridgely, 8 Cir., 262 F. 675. This case involved selections made under a law in which the State was granted Sections 16 and 36 for educational purposes with certain indemnity lands in place thereof in case they had been otherwise disposed of, the indemnity lands to be selected with the approval of the Secretary of Interior. There was no question of an allowance of a homestead entry in this case. The law provided that the selection should be made with the approval of the Secretary of the Interior and the case holds no rights are acquired until such selection is made with the approval of the Secretary.

Wilber v. United States, 1930, 60 App.D.C. 11, 46 F.2d 217. This case relates to oil prospecting permits under a special law which makes provision for making application for permit and for withdrawal thereof, and, therefore, is not in point in considering the matter before the Court.

The petitioner also cites the case of West v. Lyders, 1929, 59 App.D.C. 122, 36 F.2d 108. This case arose in the Supreme Court of the District of Columbia, and was an action to secure a restraining order against the Secretary of the Interior and the Commissioner of the General Land Office, enjoining them from canceling or rejecting plaintiff's location and selection of a tract of land known as Whaler Island, and from issuing a patent to the County of Del Norte, California, and requiring the defendants to give full legal force and effect to plaintiff's selection, excluding from consideration certain executive orders withdrawing the island from location and settlement and also an Act of Congress authorizing the Secretary of the Interior to patent the island to Del Norte County. There was an appeal from a decree awarding the injunction. The plaintiff claimed its right under Valentine's scrip. Valentine had been required to execute and deliver to the Commissioner of the General Land Office certain lands and in lieu thereof, he and his legal representatives were given the right to select and were allowed to select patents for an equal quantity of unoccupied and unappropriated public domain.

It seems that under the law, the plaintiff had made this selection, and no approval by the Land Office of said selection is anywhere mentioned.

West v. Lyders, 59 App.D.C. 122, 36 F.2d 108, 110:

" * * * Consequently, when he, or his assigns, made a selection of unappropriated public lands, he was merely exercising the vested right which he had already acquired from the government, and the vested right acquired, when completed in a valid selection, relates, not merely to the date of selection, but back to the date of the issuance of the scrip.

"If the admissions above stated can be supported upon further investigation by the Department, it would seem plaintiff has complied with all the requirements of the Department necessary to entitle him to a patent. It is settled law that, 'where the right to a patent has once become vested in a purchaser of public lands, it is equivalent, so far as the government is concerned, to a patent actually issued. The execution and delivery of the patent after the right to it has become complete are the mere ministerial acts of the officers charged with that duty.' Simmons v. Wagner, 101 U.S. 260, 261, 25 L.Ed. 910.

"In the case of Wilcox v. Jackson, 13 Pet. 498, 513, 10 L.Ed. 264, the Supreme Court said: 'But we go further, and say, that whensoever a tract of land shall have been once legally appropriated to any purpose, from that moment, the land thus appropriated becomes severed from the mass of public lands; and that no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it; although no reservation were made of it.' And, in the case of Leavenworth [, L. & G.] R. R. Co. v. United States, 92 U.S. 733, 23 L.Ed. 634, 639, the court, quoting with approval the language given in the Wilcox case, added: 'It may be said that it was not necessary * * * in deciding the case to pass upon this question; but, however, this may be, the principle asserted is sound and reasonable, and we adopt it as a rule of construction.'

"This rule of construction has been followed in numerous cases, and was reaffirmed in Payne v. Central Pac. R. R. Co., 255 U.S. 228, 41 S.Ct. 314, 316, 65 L.Ed. 598, where an injunction was sought to restrain the Secretary from canceling a selection of indemnity land under a railroad land grant. The Department defended on the ground that the land had been included in a subsequent withdrawal for power site purposes. The court, however, sustained the selection, with the observation that 'the rule applicable in such a situation is that—"A person who complies with all the requisites necessary to entitle him to a patent in a par-

ticular lot or tract is to be regarded as the equitable owner thereof." Wirth v. Branson, 98 U.S. 118, 121, 25 L.Ed. 86; Benson Mining [& Smelting] Co. v. Alta Mining [& Smelting] Co., 145 U.S. 428, 432, 12 S.Ct. 877, 36 L.Ed. 762.' "

The matter involved in this hearing necessarily came before the Interior Department in connection with the issuance of a patent to the land involved and the Department must have determined the same in favor of the defendant Morris, which decision should be seriously considered by the Court before disturbing it.

Under the facts in this case, the defendant, Julius Chapman Morris, on November 2, 1938, filed his application in the United States Land Office at Anchorage, Alaska, Serial No. 09435, filed the Hot Springs affidavit and his ex-service record notations and paid the United States Land Office the sum of $14.86, and on November 4, 1938, Land Office receipt No. 3299911 was issued to him. This was all that the defendant Morris could possibly do to perfect his entry, and the Court is of the opinion that this was all that defendant Morris was required to do under the law and the decisions above set forth, and that, therefore, the defendant Morris made a lawful homestead entry prior to April 29, 1939, the day on which the Executive Order withdrawing said land was issued, and that the defendant Morris, having made a lawful homestead entry, his rights were not affected by said Executive Order 8102.

The Court is further of the opinion that since the passage of Joint Resolution of June 12, 1930, 46 Stat. 580, 43 U.S.C.A. § 186, all public lands opened up during the following ten years under said Resolution extend an offer to ex-service men, which offer, if accepted and complied with by ex-service men, becomes a valid existing right, which the ex-service men should be able to enforce against the Government, and that, therefore, since the withdrawal was made subject to all valid existing rights, the withdrawal of

April 29, 1939, did not affect the defendant Morris, an ex-service man who had fully complied with said Resolution.

The attorneys for the defendants may present findings of fact, conclusions of law and an order or decree, in accordance with this opinion.