*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JILU H. LUKER and GEORGE W. LUKER II, | ) ) ) | Supreme Court Nos. S-14744/14763 |
| Appellants and Cross-Appellees, | ) ) ) | Superior Court No. 4FA-06-02646 CI |
| v. | ) ) ) | O P I N I O N |
| DWANE J. SYKES, | ) ) ) | No. 7059 - October 16, 2015 |
| Appellee and Cross-Appellant. | ) ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Jilu H. Luker, pro se, Canyon Country, California, Appellant and Cross-Appellee.[1] Dwane J. Sykes, pro se, South Ogden, Utah, Appellee and Cross-Appellant.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

---

[1]     The appeal was brought by both Jilu and George Luker, but George Luker died while the appeal was pending.

## I.    INTRODUCTION

A property owner sued neighboring property owners, claiming that he had access rights across their land because of both an express easement and a right of way created by federal law. He also sought damages for a number of alleged torts. Following trial, the superior court found that both the express easement and the federally created right of way existed but found against the easement holder on all his tort claims. The owners of the burdened property appealed the finding of a federally created right of way, and the easement holder cross-appealed the superior court's dismissal of his damages claims and its rulings on a number of procedural issues.

We reverse the superior court's finding of a federally created right of way, concluding that the court erred in determining when the land at issue became private land not subject to the federal law. We affirm the superior court's judgment in all other respects, including its finding of an express easement.

## II.    FACTS AND PROCEEDINGS

The central issue in this case is whether Duane Sykes has a right to access his property across his neighbors' lots, identified in this opinion by their tax lot numbers, 3318 and 3353. The land containing the two lots — now belonging to Jilu and George Luker — was originally obtained from the United States government by Elbridge Walker through the federal homestead laws.[2] Walker applied for a patent to the land in October

---

[2]    *See* 43 U.S.C. §§ 161-263 (1958). The homestead laws of the United States were extended to the District of Alaska prior to statehood with District- (and then Territory-) specific provisions, *see* 48 U.S.C. §§ 371-80a (1958), and the provisions relevant to this case continued in force after statehood. *See* An Act to Provide for the Admission of the State of Alaska Into the Union, Pub. L. 85-508 § 8(d), 72 Stat. 339, 344-45 (1958) ("Upon admission of the State of Alaska into the Union as herein provided, all of the Territorial laws then in force in the Territory of Alaska shall be and

(continued...)

1958 and again in July 1961. The U.S. Department of the Interior's Bureau of Land Management (BLM) approved a survey of the land in 1962, and the Department issued Walker a patent in 1963. The property was acquired by Sykes's wife in 1973 in a foreclosure sale, and in August 1974 the Sykeses transferred it to a holding company they controlled called Frontier International Land Corporation.

Frontier International announced through newspaper advertisements that it intended to sell a number of 2.5- and 5-acre parcels at public auction in September and November 1974. The advertisements, and other information posted at the auction sites, explicitly reserved to the sellers several easements for access to nearby Chena Hot Springs Road to the north and Grange Hall Road to the east. As relevant here, they included what is labeled on a drawing as a "66' R.O.W." from the interior of the property east to Grange Hall Road, running on a straight line between sections 28 and 29 on the north and sections 32 and 33 (containing tax lots 3318 and 3353) on the south.

Among the purchasers were Donald and Cossette Kimmel, who on September 28, 1974 signed a real estate contract for two 2.5-acre lots, tax lots 3318 and 3353, and received a statutory warranty deed for the property from Frontier International.

---

**²**(...continued)
continue in full force and effect throughout said State except as modified or changed by this Act, or by the constitution of the State, or as thereafter modified or changed by the legislature of the State."); *see also* 43 U.S.C. §§ 270, 270-5 to 270-12, 270-14 to 270-17 (1964 supp.) (recodification of former 48 U.S.C. §§ 371-80a (1958)).

The homestead laws were repealed by the Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579 § 702, 90 Stat. 2743, 2787 (1976). We refer to the relevant Alaska-specific provisions by their 1958 codification in territorial law at Title 48 of the U.S. Code, their last publication before the relevant events in this case.

Pursuant to the terms of the contract, the deed was placed in escrow pending "full payment of [the] purchase price" and not recorded until November 1977. In the meantime, two months after the contract was signed, the Sykeses recorded a Grant of Access Easement dated November 29, 1974, which purported to give the Sykeses "a perpetual easement for roadway purposes" along the line shown in the auction materials.[3] Cosette Kimmel attested by affidavit that she and her husband had been aware of the claimed easements when they purchased the lots and had intended that their lots be subject to the easements shown in the Sykeses' later-recorded grant.[4]

The Lukers purchased lots 3318 and 3353 from the Kimmels in 1999. They were soon in a dispute with Dwane Sykes over his claim to an easement. Sykes wanted to connect an existing interior road with Grange Hall Road on the east by completing an access road along the northern boundary of the Lukers' lots. But the Lukers considered Sykes's easements to be defective, and they contested his rights to access and to perform any further construction on the road. They eventually installed a locked gate at the Grange Hall Road end of the claimed easement.

Sykes filed suit against the Lukers in 2006. He sought declaratory relief and argued that he was entitled to use the north 33 feet of lots 3318 and 3353 pursuant to his express easement as well as a right of way established under federal law, former

---

[3]     The easement also covers "the North 33 feet of the East 1550 feet of section 32" on land identified as tax lot 3208, also owned by the Lukers. The Lukers did not dispute at trial that Sykes was entitled to an easement over that land.

[4]     Over the Lukers' objection, the superior court admitted Cosette Kimmel's affidavit into evidence at trial under Alaska Evidence Rule 804(b)(5) as having circumstantial guarantees of trustworthiness equivalent to those of listed exceptions to the hearsay rules. The Lukers do not challenge this ruling on appeal.

43 U.S.C. § 932 (1958), Revised Statute 2477 (abbreviated as "RS 2477").[5] Sykes also alleged that the Lukers' interference with his rights of access had damaged the value of his remaining lots, frightened off prospective buyers, and caused him emotional distress.[6] He claimed hundreds of thousands of dollars in actual damages as well as treble and punitive damages.

The parties eventually reached a stipulated judgment, which the court signed in 2009. Two years later, however, the Lukers moved that the judgment be set aside, claiming that it included language Sykes had inserted without their approval. The superior court set the judgment aside and scheduled a trial. With both sides proceeding pro se, the superior court then dealt with what it termed "a barrage of motions filed by [Sykes] and one motion filed by the Luker Defendants," most of which did not conform with the Alaska Civil Rules or "have support in law or fact."

A four-day bench trial was held in December 2011, after which the superior court found both an express easement for Sykes and an RS 2477 right of way over the Lukers' property.[7] But it also found that Sykes had failed to prove any of his claims for

---

[5]     Like the homestead statutes, RS 2477 was repealed by the Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793 (1976).

[6]     In his complaint, Sykes also asserted claims based on an "easement apparent," "easement of reasonable necessity," and "easement of absolute necessity." Sykes has not raised issues related to these claims on appeal, and we therefore do not address them.

[7]     The superior court also discussed a utility easement in favor of Golden Valley Electrical Association, the validity of which had been raised during trial. The court noted that there was "no evidence that the utility easement is anything but valid" and made "no other findings regarding the utility easement." Neither party raises any claims on appeal with regard to the utility easement.

damages. Due to the number of unsuccessful claims and the amount of damages Sykes had sought, the superior court found the Lukers to be the prevailing parties and awarded them costs under Alaska Civil Rule 79.

The Lukers appeal, challenging the superior court's finding of an RS 2477 right of way. Sykes cross-appeals, arguing that the superior court judge should have recused himself because of bias. He also contends that the superior court erred in finding against him on his damage claims, in its management of discovery, in denying his motion for partial summary judgment and failing to grant oral argument on the motion, in limiting the time allowed for his presentation of evidence at trial, and in finding that the Lukers were the prevailing parties.

## III.    STANDARDS OF REVIEW

Whether an RS 2477 right of way exists "is based upon factual findings about property use and legal conclusions about whether the use was sufficient to establish" the right of way; we review the superior court's factual findings for clear error and the application of the law to the facts de novo.[8]

We review for abuse of discretion the superior court's discovery rulings,[9] control over trial proceedings,[10] and determination of prevailing party status for purposes of Alaska Civil Rule 79.[11]

We review "a request for disqualification of a judge based on the

---

[8]    *Price v. Eastham*, 75 P.3d 1051, 1055 (Alaska 2003).

[9]    *Wooten v. Hinton*, 202 P.3d 1148, 1151 (Alaska 2009).

[10]    *See Am. Nat'l Watermattress Corp. v. Manville*, 642 P.2d 1330, 1339 (Alaska 1982).

[11]    *BP Pipelines (Alaska) Inc. v. State, Dep't of Revenue*, 327 P.3d 185, 189 (Alaska 2014) (citations omitted).

appearance of impropriety" de novo[12] and "denial of a motion to disqualify a judge for abuse of discretion."[13]

## IV. DISCUSSION

### A. The Superior Court's Conclusion That An RS 2477 Right Of Way Existed Was Erroneous.

The Lukers focus their appeal on the superior court's conclusion that there was an RS 2477 right of way on their property.[14] We agree and reverse this aspect of the superior court's decision.

Enacted as part of the Lode Mining Act of 1866,[15] RS 2477 provided that "the right of way for the construction of highways over [federal] public lands, not reserved for public uses, is hereby granted."[16] "The grant was self-executing, meaning that an RS 2477 right-of-way automatically came into existence if a public highway was

---

[12] *Griswold v. Homer City Council*, 310 P.3d 938, 941 (Alaska 2013).

[13] *Greenway v. Heathcott*, 294 P.3d 1056, 1062 (Alaska 2013).

[14] The Lukers' opening brief defined "[t]he crux of the issue" as whether Alaska law post-statehood "created easements on property . . . that the BLM had previously passed . . . to the Walkers[] under Federal regulations in force for Federal land transfers." (Emphases omitted.) Their reply brief reiterated: "Luker's appeal was clearly limited to question the Judge's opinion that a section line right of [way] existed on subject [property] at the time Sykes's wife purchased the property at a distressed property sale."

[15] *See Price v. Eastham*, 75 P.3d 1051, 1055 (Alaska 2003) (citing Leroy K. Latta, Jr., *Public Access Over Alaska Public Lands as Granted by Section 8 of the Lode Mining Act of 1866*, 28 SANTA CLARA L. REV. 811, 811 (1988)).

[16] *Fitzgerald v. Puddicombe*, 918 P.2d 1017, 1019 (Alaska 1996) (quoting 43 U.S.C. § 932, *repealed by* Pub. L. No. 94-579, Title VII, § 706(a), 90 Stat. 2793 (1976)) (internal quotation marks omitted).

established across public land in accordance with the law of Alaska."[17] Alaska, like other public authorities, could accept the federal grant and create a right of way for road construction by taking "some positive act . . . . clearly manifesting an intention" to do so.[18] We have recognized that the Territorial legislature accepted the federal grant by its passage of chapter 35, § 1, SLA 1953 (now codified as AS 19.10.010), which dedicated tracts of land between all sections for public highways and thereby "effectively established the territory's claim to the federal right-of-way grant."[19]

In this case, the parties dispute whether a right of way was imposed on the section line dividing the Lukers' property from the sections to their north. The section lines were created on April 16, 1962, when the BLM accepted the official survey of the land.[20] Whether the land was "public lands, not reserved for private uses" on that date is determinative: if it was, then an RS 2477 right of way was created along the section

---

[17] *Price*, 75 P.3d at 1055 (citing *Fitzgerald*, 918 P.2d at 1019) (internal quotation marks omitted).

[18] *Girves v. Kenai Peninsula Borough*, 536 P.2d 1221, 1226 (Alaska 1975) (quoting *Hamerly v. Denton*, 359 P.2d 121, 123 (Alaska 1961)).

[19] *Id.* at 1226-27. The public highway dedication was tracts 100 yards wide between sections of land owned by or acquired from the state and tracts "four rods wide between all other sections in the state." AS 19.10.010.

[20] *See Cox v. Hart*, 260 U.S. 427, 436 (1922) ("A survey of public lands does not ascertain boundaries; it creates them . . . . [T]he running of lines in the field and the laying out and platting of townships, sections and legal subdivisions are not alone sufficient to constitute a survey. Until all conditions as to filing in the proper land office and all requirements as to approval have been complied with, the lands are to be regarded as unsurveyed and not subject to disposal as surveyed lands. . . . In other words, to justify the application of the term 'surveyed' to a body of public land something is required beyond the completion of the field work and the consequent laying out of the boundaries, and that something is the filing of the plat and the approval of the work of the surveyor.").

line by operation of law.[21]

The parties agree that the property at issue was "reserved for private uses" once Elbridge Walker acquired the right to homestead on it. The Lukers contend this occurred in 1958, upon Walker's first application for patent.[22] Sykes contends it did not occur until 1963, when the BLM, as the federal agency charged with administering the homestead laws,[23] allowed Walker's entry.

The superior court agreed with Sykes. It relied on notations in the BLM's case abstract system, including the notation "Application Filed" on two dates, October 27, 1958 and July 10, 1961, and "Authorization Issued ENTRY ALLOWED" on August 28, 1963. Based on this evidence, the court concluded:

> Walker made three entry claims for the property: 27 October 1958, 10 July 1961, and finally in 28 August 1963. The first two entries were not successful; the last entry, after the filing of the U.S. survey, ultimately resulted in the issuance of a patent to the Walkers. The court finds the critical entry for purposes of determining whether a section line applies is the last entry that resulted in the issuance of a patent . . . .

The superior court concluded that it was when the BLM recognized Walker's entry in 1963 that he established rights to the land under the Homestead Act. And because the survey had previously been accepted (and the section lines created) in 1962, the superior court found that an RS 2477 right of way necessarily existed over the land.

---

[21]     *See Girves*, 536 P.2d at 1226-27.

[22]     Although the Lukers also argue that AS 19.10.010 does not apply because Walker's first attempt to enter the land was in 1958 and thus prior to statehood, AS 19.10.010 is simply the adoption as state law of ch. 35, § 1, SLA 1953, the territorial law in effect at that time. *Girves*, 536 P.2d at 1226.

[23]     *See* Reorganization Plan No. 3 of 1946, Pub. L. No. 79-733 § 403, 60 Stat. 1097, 1100 (1946).

The superior court was correct in concluding that "the critical entry for purposes of determining whether a section line applies is [the] . . . entry that resulted in the issuance of a patent." But it was error to conclude that Walker had a claim to such a patent only upon the BLM's approval of his entry.

Under the now-repealed homestead laws, a party established a claim to land not when the federal authorities allowed entry but rather when the party took the steps necessary to have entry recognized. " '[Entry] means that act by which an individual acquires an inceptive right to a portion of the unappropriated soil of the country by filing his claim' in the appropriate land office."[24] In Walker's case, that "inceptive right" was acquired when he filed his application for entry. Completing the application requirements and "fil[ing] his application in the United States Land Office" was "all that [an applicant] could possibly do to . . . [make] a lawful homestead entry."[25] At that point, the lands at issue became "subject to individual rights of a settler. . . . [T]he portion covered by the entry [was] then segregated from the public domain . . . and until such time as the entry may be cancelled by the government or relinquished, the land [was] not

---

[24] *Hillstrand v. State*, 395 P.2d 74, 76 (Alaska 1964) (alteration in original) (quoting *Chotard v. Pope*, 25 U.S. 586, 588 (1827)).

[25] *United States v. 348.62 Acres of Land in Anchorage Recording Dist.*, 10 Alaska 351, 364 (D. Alaska 1943); *see also Hastings & D.R. Co. v. Whitney*, 132 U.S. 357, 363 (1889) ("Under the homestead law three things are needed to be done in order to constitute an entry on public lands: First, the applicant must make an affidavit setting forth the facts which entitle him to make such an entry; second, he must make a formal application; and, third, he must make payment of the money required. When these three requisites are complied with, and the certificate of entry is executed and delivered to him, the entry is made, the land is entered."); *Ault v. State*, 688 P.2d 951, 954 (Alaska 1984) (quoting *348.62 Acres*, 10 Alaska at 359).

included in grants made by Congress under [RS 2477]."[26]

While Walker's land was unsurveyed prior to 1962, the homestead laws allowed the filing of an application for entry onto unsurveyed land along with a requirement of final proof.[27] The applicant could obtain patent to the land subject to a later survey[28] (or in certain cases without any survey at all[29]).

That is what happened in Walker's case. The evidence at trial showed that the BLM received his 1958 and 1961 applications and that he filed his final proof in 1961.[30] At that point, the land became "subject to individual rights of a settler" and could no longer be "included in grants made by Congress under [RS 2477]."[31] When section

---

[26]     *Hamerly v. Denton*, 359 P.2d 121, 123 (Alaska 1961).

[27]     *See* 48 U.S.C. § 371 (1958); Applications for Entry, 22 Fed. Reg. 1431 (Mar. 7, 1957) (codified at 43 C.F.R. § 65.8(b) (1962 cum. supp.)) ("A homestead application must describe the lands desired, if unsurveyed, by metes and bounds . . . . A homestead application for unsurveyed lands must be accompanied by the settler's final or commutation homestead proof.").

[28]     48 U.S.C. § 375 (1958); 43 C.F.R. § 65.8 (1962 cum. supp.).

[29]     *See* 48 U.S.C. § 371 (1958).

[30]     In support of his contention that 1963 was the date when Walker obtained rights to the land under the Homestead Act, Sykes presented evidence at trial that Walker had "abandoned" his claim by failing to meet the homestead requirements for some indefinite period. While such evidence might have been relevant to a challenge to Walker's initial claim, *see* 43 C.F.R. § 221.1 (1954), it was insufficient to show that his patent from the BLM was defective. The BLM accepted Walker's application, and "actions by the land office personnel . . . show a recognition of [Walker's] incipient right to the land. We will not subject the entryman or his successors in interest to a loss of land because of a defective application for entry, when such was acquiesced in . . . by the agents of the government." *Hillstrand v. State*, 395 P.2d 74, 77 (Alaska 1964).

[31]     *Hamerly*, 359 P.2d at 123. The practice of the Department of the Interior
(continued...)

- 11 -                                                          **7059**

lines were later created in April 1962 upon the federal authorities' acceptance of the survey, Walker had already established his claim to the land, which had therefore ceased to be "public lands, not reserved for private uses."[32]  For this reason we reverse the superior court's finding that the Lukers' property is burdened by an RS 2477 right of way.

B. **The Superior Court's Finding That An Express Easement Existed Is Not Clearly Erroneous.**

The superior court also found that the evidence supported the existence of "private easements of record" as "noted on the auction offering and memorialized in sale contracts and deeds conveyed to purchasers," and that "all the subject lots are subject [to] the benefits and burdens of these easements."  As noted above, the Lukers focus their appeal on the RS 2477 right of way.[33]  But an express easement differs from an RS 2477 right of way in important respects and is not governed by our discussion above.[34]

---

[31](...continued)
illustrates the operation of this principle. *See, e.g.*, Albert A. Howe, 26 IBLA 386 (1976) ("[W]hen appellant filed his application on May 24, 1973, such filing segregated the lands encompassed by the application.  This is true despite the fact that the entry was not allowed by [the Bureau] until more than 2-1/2 years later, because at the time the application was filed appellant was qualified, he had done all that was required by law to apply, and the land was subject to appropriation by homestead entry on the date of the filing.").

[32]  *See* 43 U.S.C. § 932 (1958).

[33]  *See* note 14, above.

[34]  Sykes's express easement was created by deed from Frontier International, and the scope of his rights is determined by the intent of the parties to the deed.  *See Windel v. Mat-Su Title Ins. Agency, Inc.*, 305 P.3d 269, 271 (Alaska 2013) (citing *Dias v. State, Dep't of Transp. & Pub. Facilities*, 240 P.3d 272, 274 (Alaska 2010)) (setting out analysis for determining scope of easement granted by deed). In contrast, "[a]

(continued...)

Although there was no RS 2477 right of way, we conclude that the evidence was sufficient to support the superior court's finding of express easements tracing the same routes.

Frontier International's announcements of the 1974 land auction specifically reserved access easements "unto the seller, his heir [sic] and assigns, and unto all successors in interest" and referred potential buyers to attached maps. The easements were described as "a perpetual easement over and upon the roadways and easements indicated on the above stated parcels" and were further defined as "30 (or 50) feet in width on each side of any section line as established under A.S. 19.10.010" and "30 feet in total width for all other easements unless otherwise designated." The immediate buyer of the parcels at issue here, Cosette Kimmel, attested unequivocally that she was well aware of the claimed easements and intended that the land she purchased be subject to them. The real estate contract between Frontier International and the Kimmels specifically acknowledged the reservation of easements as described in the auction announcements.

---

(...continued)
section-line easement [under AS 19.10.010 and its predecessors] is a statutorily-created public right-of-way owned by the State of Alaska," *Hillstrand v. City of Homer*, 218 P.3d 685, 688 (Alaska 2009), and its scope depends on interpretation of the statute. *See 0.958 Acres, More or Less v. State*, 762 P.2d 96, 99-100 (Alaska 1988) (determining servient estate owner's right of access to public highway constructed on RS 2477 easement by noting that "[n]othing in AS 19.10.010" supports the owner's argument and that the owner's proposed "rule would be inconsistent with the purpose of the statute"); *see also* RESTATEMENT (THIRD) OF SERVITUDES § 4.1(1) (2000) ("A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding the creation of the servitude, and to carry out the purpose for which it was created.").

Given that the existence and scope of an express easement depend on the intentions of the parties to the grant,[35] and given the evidence in this case that Frontier International and the Kimmels intended that the access easements be reserved to Frontier International, we see no error in the superior court's conclusion that the Lukers' lots remained "subject to the easements noted on the auction offering."[36]

## C.   None Of The Issues Raised In Sykes's Cross-Appeal Have Merit.

Sykes raises a number of issues in his cross-appeal. First, he argues that the trial judge should have recused himself because of actual bias and the appearance of bias. Sykes never requested that relief in the superior court.[37] We have not determined the standard of review to be applied to unpreserved claims of judicial bias,[38] but even assuming de novo review — the most exacting standard — Sykes fails to convince us

---

[35]   *Windel*, 305 P.3d at 271.

[36]   As noted above, Frontier International transferred its interest in the easements to Sykes a few months after it had sold the lots to the Kimmels.

[37]   Sykes argues that a motion he filed for a partial, final judgment pursuant to Alaska Civil Rule 54(b) was a "pro se litigant's . . . attempt at disqualification of judge," on the theory that an appealable judgment would "put him before the Supreme Court for review of the trial court's biased proceedings." But we see nothing in the motion that would reasonably convey that its purpose was disqualification of the judge. Although we grant pro se litigants "considerable leeway with regard to procedural requirements" and excuse procedural defects "when a deficiency results from lack of familiarity with the rules," that leeway is inappropriate when an "appellant did nothing that informed the trial court it should advise [him] how to accomplish something [he] might have been attempting to do." *Greenway v. Heathcott*, 294 P.3d 1056, 1071 (Alaska 2013) (quoting *Wright v. Shorten*, 964 P.2d 441, 444 (Alaska 1998)) (internal quotation marks and citation omitted).

[38]   *Greenway*, 294 P.3d at 1071 ("It is not obvious what standard of review applies to an appellate claim that a trial court was biased, if the trial court had no opportunity — such as by motion for recusal, disqualification, or new trial — to resolve a claim of judicial bias.").

his claim has merit.

"To prove a claim of judicial bias, the claimant must show that the judge formed an opinion of [him] from extrajudicial sources, resulting in an opinion other than on the merits."[39] Sykes's claims rest first on the superior court's adverse rulings. "But [d]isqualification was never intended to enable a discontented litigant to oust a judge because of adverse rulings made,"[40] and "[m]ere evidence that a judge has exercised his judicial discretion in a particular way is not sufficient to require disqualification."[41] Sykes also cites the superior court's criticism of his conduct during the course of proceedings and the fact that the court blamed him for litigation delays he asserts were the fault of the Lukers instead. But we have also held that "expressions of impatience, dissatisfaction, annoyance and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" do not establish bias or partiality.[42] While the superior court's patience was taxed by the proceedings, it acted with appropriate restraint. Its dissatisfaction with Sykes's performance in court does not demonstrate an inability to decide the case's substantive issues on their merits.

Sykes also argues that the superior court erred when it found that he failed to prove his various claims for damages in tort. Although Sykes presented a great deal

---

[39] *Ronny M. v. Nanette H.*, 303 P.3d 392, 409 (Alaska 2013) (alteration in original) (quoting *Williams v. Williams*, 252 P.3d 998, 1010 (Alaska 2011)).

[40] *Sagers v. Sackinger*, 318 P.3d 860, 867 (Alaska 2014) (alteration in original) (quoting *Wasserman v. Bartholomew*, 38 P.3d 1162, 1171 (Alaska 2002)) (internal quotation marks omitted).

[41] *Id.* (quoting *State v. City of Anchorage*, 513 P.2d 1104, 1112 (Alaska 1973)).

[42] *Kingery v. Barrett*, 249 P.3d 275, 286 n.43 (Alaska 2011) (quoting *Hanson v. Hanson*, 36 P.3d 1181, 1184 (Alaska 2002)).

of documentary evidence at trial, his damage claims relied largely on his own testimony, which the Lukers directly contested. The superior court found that Sykes had failed to carry his burden of proof on claims for intentional infliction of emotional distress, interference with a business relationship, defamation, slander of title, and abuse of official position, and that to the extent the facts were in dispute, the Lukers' testimony was more credible. "[I]t is the function of the superior court, not of this court, to judge witness credibility and to weigh conflicting evidence,"[43] and "if most of the evidence is oral testimony, or the superior court's factual determinations depend largely on conflicting testimony, then the superior court's greater ability to assess witness credibility requires deferential review by this court."[44] Given this deferential review, we see no clear error in the superior court's decision of the heavily fact-dependent tort claims.

Sykes next argues that the superior court erred in denying his motions to compel, to deem certain matters admitted, and to continue trial so that he could do more discovery. The superior court considered these issues at a pretrial conference. It found the Lukers' responses to requests for admission sufficient given their pro se status. It recognized Sykes's difficulty in scheduling the Lukers' depositions before trial given that the parties all lived outside of Alaska, and it ordered that the Lukers appear for hour-long depositions on the first morning of trial. It agreed that the Lukers' responses to some written discovery were "somewhat troublesome" and "reserve[d] ruling on those requests" until trial, warning that "if [the requests] weren't in fact responded to in a fair and complete way or otherwise timely objected to, [its] intent would be to preclude the defense from offering evidence contrary to the information that was requested."

---

[43]     *Fyffe v. Wright*, 93 P.3d 444, 450 (Alaska 2004).

[44]     *Id.* at 450-51.

We review "a trial court's discovery rulings for abuse of discretion."[45] We conclude that the superior court acted well within its discretion in addressing these discovery matters. We further conclude that Sykes waived his complaints about the sufficiency of the Lukers' discovery responses when he failed to raise the issue again as the evidence came out at trial, as the superior court had invited him to do.[46]

Sykes next argues that the superior court erred by failing to grant oral argument on his motion for partial summary judgment on the existence of an easement, then denying the motion. Acknowledging that he prevailed at trial anyway on the easement issue, he contends that a grant of summary judgment would have given him more trial time for his tort claims and a greater chance to win them. This argument is too speculative for us to credit. Trial of the easement issues mooted any claim on appeal that the court earlier erred in denying partial summary judgment on the same issues.[47]

Sykes also argues that the superior court erred by limiting his trial time. Resolving this claim "necessarily depends on the facts of each case. We are not willing to condemn time limits in the abstract, and the issue can be raised by a party actually

---

[45] *Gibson v. GEICO Gen. Ins. Co.*, 153 P.3d 312, 316 (Alaska 2007).

[46] *See Millette v. Millette*, 177 P.3d 258, 268 (Alaska 2008) (holding issue waived when "[b]y proceeding through almost the entire . . . hearing without mention of his motion to compel, [the plaintiff] did not sufficiently bring the issue to the superior court's attention").

[47] *See Larson v. Benediktsson*, 152 P.3d 1159, 1168 (Alaska 2007) (holding that orders denying summary judgment because of genuine issues of material fact become "unreviewable after a trial on the merits").

claiming prejudice."[48]  Sykes fails to identify any prejudice.[49]  His "conclusory arguments that his case was curtailed do not establish error or prejudice.  They give us no basis for saying that these time limits were inappropriate, or for offering guidance to the trial courts."[50]

Finally, Sykes argues that the superior court abused its discretion when it found the Lukers to be the prevailing parties for the purpose of an award of costs under Alaska Civil Rule 79.  Sykes prevailed on the existence of an RS 2477 right of way (a decision we now reverse) and an express easement, but he failed to prove any of his claims for hundreds of thousands of dollars in damages.  "We have held that a litigant who successfully defeats a claim of great potential liability may be the prevailing party even if the other side receives an affirmative recovery."[51]  The superior court reasonably applied that principle here, and we see no abuse of discretion in its finding that the Lukers were the prevailing parties for purposes of Rule 79.

## V.    CONCLUSION

We REVERSE the superior court's decision that an RS 2477 right of way existed over the Lukers' parcels pursuant to federal law.  We AFFIRM the superior court's decision in all other respects.

---

[48]    *City of Fairbanks v. Rice*, 20 P.3d 1097, 1110 (Alaska 2000).

[49]    In this case, the superior court scheduled trial for four days and allowed Sykes to use the first three, leaving the Lukers with the one remaining.

[50]    *Rice*, 20 P.3d at 1110.

[51]    *Alaska Constr. & Eng'g, Inc. v. Balzer Pac. Equip. Co.*, 130 P.3d 932, 935-36 (Alaska 2006) (quoting *Buoy v. ERA Helicopters, Inc.*, 771 P.2d 439, 448 (Alaska 1989)) (internal quotation marks and citations omitted).